**GEO. A. HORMEL & CO., Plaintiff,**

v.

**LOCAL UNION NO. P–31, AMALGA-MATED MEAT CUTTER AND BUTCHER WORKMEN OF NORTH AMERICA, AFL–CIO, et al., Defendants.**

Civ. No. 72–C–2025–C.

United States District Court,
N. D. Iowa, C. D.

Oct. 2, 1972.

James L. Rogers, John R. Phillips, James R. Swanger, Swift, Brown, Rogers, Winick & Randall, Des Moines, Iowa, for plaintiff.

Harry H. Smith, Sioux City, Iowa, and Eugene Cotton and Robert H. Nichols, Chicago, Ill., for defendants.

## MEMORANDUM AND ORDER

HANSON, Chief Judge.

In this action brought under Section 301 of the Labor-Management Relations Act of 1947, as amended, 29 U.S.C., Section 185 et seq., plaintiff, Geo. A. Hormel & Co., prays for a preliminary injunction pursuant to Rule 65, F.R.Civ.P. to restrain the union and other defendants from "causing or taking part in any strike, work stoppage, work slowdown, refusal to work at established work levels or interference which will interrupt or interfere with the plaintiff's operations." [1]

In addition plaintiff prays that the defendants be affirmatively ordered to process Grievance Number 702 and other related grievances concerning work standards pursuant to the grievance-arbitration policies and provisions of the Contract.[2] At hearings on September 21 and September 23, this Court received evidence in support of and in opposition to the above application.

This action involves a dispute over work standards established for the hog cut section of the Geo. A. Hormel Co. These work standards determine the basic speed at which employees must work and are the basis for computing incentive pay when the employees work at speeds faster than standard. In August of 1971 new equipment was installed in the hog cut department as part of an effort to modernize the plant. At this time new temporary standards were set for the hog cut floor requiring higher production to earn incentive pay. On February 9, 1972, a new permanent standard was issued. The union filed

---

1. Page 2 of Amended Pleadings filed September 18, 1972.

2. "Working Agreement between United Packinghouse, Food and Allied Workers of America (UPWA) AFL–CIO, Local 31 and Geo. A. Hormel Co., Fort Dodge, Iowa," dated November 2, 1953 as revised May 1, 1960 and January 1, 1966.

Grievance 702 dated February 16, 1972 challenging the new standard. This grievance has not been resolved from that date until the present time. Up to September 9, 1972, the hog cut gang worked at the new standards, but on this date the members of the gang expressed a desire to work at the old standard which they considered part of their working agreement. The Company in response suspended these employees until such time as they agree to work at the new standard. The Company also requested that the union process Grievance 702 through the grievance-arbitration provisions of the contract.

The union has repeatedly stated to the Company and to this Court that work standards are not subject to the grievance-arbitration provisions of the contract. Rather the union views work standards as part of a working agreement, which includes the written contract and other documents such as the work standards. The union feels that standards are subject to negotiation and not the grievance-arbitration machinery of the contract.

Central to the issues in this case is whether this grievance over work standards falls within the scope of the grievance-arbitration provisions of the contract.[3]

3. ARTICLE VII—GRIEVANCE PROCEDURE

Section 1—Policy.

It is the intent of both parties that misunderstandings be avoided and that all procedures shall be just, fair and equitable.

To that end, it is agreed that mutual understandings to be effective shall be in writing and regular grievance procedure shall be followed.

The arbitration provisions contained herein are intended to permit the Arbitration Board to determine issues on the basis of what appears to be fair, just and equitable and to direct such action as may satisfy the policy here expressed.

Section 2—Work Instruction.

Any instructions regarding the work or working conditions of an individual or group may come directly to that individual or group from the appropriate person in a supervisory capacity, except that ordinary major changes in work and working conditions, except in cases of emergency, will be effected by no less than seven days' notice in writing to the Union.

An employee or group of employees who take exceptions to any work instruction or written notice shall rely upon regular grievance procedure for relief from an inequity claimed . . . .

Section 3—Regular Grievance Procedure.

An employee wishing to enter a grievance or make a request shall do so in writing and shall receive a dated receipt therefore from the management. If the employee is unable to write, the grievance of request shall be submitted in his behalf by another union member (of his own choice) as his agent. Grievances or requests shall be answered as soon as possible, but unless there is mutual consent to the contrary, grievances shall be answered within ten days.

A grievance which has been denied or which has not been answered in ten days may be appealed in writing to the Employment Manager of the Company at Austin. Except as may be otherwise arranged by mutual agreement, the Employment Manager shall answer this appeal within twenty-one days.

A grievance which has been disallowed by the Employment Manager, or to which he has not replied within the twenty-one days, may be appealed to the president of the Company. Such appeal, at the option of the local union, may be made in writing by registered mail addressed to the President of the Company, or may be made in person by a representative of the local or its national organization calling upon the President of the Company or his proxy. The President of the Company shall reply by registered letter mailed not later than ten days after the mail delivery of the appeal to him, or ten days after the call by such representative of the local or its national organization.

When such request or grievance is settled, either by or before arbitration, any allowance with respect to such claim for payment or affirmative action shall be retroactive whenever possible to the day of the filing of the original grievance.

A grievance or request to which the President of the Company has not replied within the ten-day period or which he has denied may within the thirty days of the expiration of the ten-day period be carried to arbitration as hereinafter provided. Where an appeal to arbitration is filed, the parties hereto shall appoint their representatives within a period of

The decision of the United States Supreme Court in Boys Markets, Inc. v. Retail Clerk's Union, Local 770, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970) guides this Court in granting injunctive relief:

"A District Court entertaining an injunction under § 301 may not grant injunctive relief against concerted activity unless and until it decides that the case is one in which an injunction would be appropriate despite the Norris-LaGuardia Act. When a strike is sought to be enjoined because it is over a grievance which both parties are contractually bound to arbitrate, the District Court may issue no injunctive order until it first holds that the contract *does* have that effect; and the employer should be ordered to arbitrate, as a condition of his obtaining an injunction against the strike. Beyond this, the District Court must, of course, consider whether issuance of an injunction would be warranted under ordinary principles of equity— whether breaches are occurring and will continue, or have been threatened and will be committed; whether they have caused or will cause irreparable injury to the employer; and whether the employer will suffer more from the denial of an injunction than will the union from its issuance." 398 U. S. at 254, 90 S.Ct. at 1594.

Pursuant to the holding of *Boys Markets*, the Court's first inquiry is whether the Company and Union were bound to arbitrate disputes under the Contract. Mandatory arbitration is essential to the granting of injunctive relief. This Contract provides that the Company must submit to final and binding arbitration if the union elects to pursue arbitration as the last step of the grievance procedure.

The Company, however, cannot initiate arbitration since the provisions of the grievance-arbitration procedure only allow the union to pursue a grievance. The defendants in their brief contend that this is fatal to the plaintiff's petition in that the Supreme Court has never compelled *unions* to arbitrate under Section 301 "in the absence of a collective bargaining agreement expressly granting the employer the right to initiate grievances or itself submit a dispute to arbitration." [4] The Third Circuit, however, has said in Avco Corporation v. Local Union #787 of Int. Union, United A. A. & A. Imp. Wks., 459 F.2d 968, 972–973 (3rd Cir. 1972) that mutuality of access to arbitration is not required to have a mandatory arbitration clause. It is sufficient if the company is required to submit to arbitration at the request of the union and the union is required by the contract to use the grievance-arbitration machinery to settle disputes rather than self-help economic force.

The defendants argue the union is not required to pursue successive steps in

five days from the date of filing of such application. Failure to do so on the part of either party will automatically constitute a default.

ARTICLE VIII—ARBITRATION.

For the purpose of establishing fair, reasonable and equitable conclusions to any controversy; an Arbitration Board shall be formed consisting of one person selected by the Union, one chosen by the Company, and one chosen by these two. The person selected by the Union shall not be a member of the Union, and the member chosen by the Company shall not be an employee or common stockholder of the Company. If the two are not able to agree upon such third member, either party may, upon five days' notice to the other, apply to the Conciliation Service of the Deparment of Labor of the United States for the appointment of such a third member of the Aribitration Board. The third member of the Board shall act as its chairman.

All decisions of the Arbitration Board shall be final and binding on both parties.

Fees and expenses of the first two members of the Board shall be paid by their respective nominators, and those of the chairman shall be equally borne equally by the Union and the Company.

4. Section IV of "Memorandum of Defendants in Support of Motion to Dismiss Complaint," filed September 21, 1972.

the grievance process because the contract states "[a] grievance which has been denied [in the first step] . . . *may be appealed* . . . to the Employment Manager of the Company at Austin"; that "[a] grievance which has been disallowed by the Employment Manager . . . *may be appealed* to the President of the Company"; and that "[a] grievance . . . [denied by the President] . . . *may* . . . be carried to arbitration." (Emphasis added)[5] The union contends the word *may* at each successive step of the grievance-arbitration procedure makes this grievance-arbitration provision of the contract non-mandatory. The defendants also point out that there are no time limits imposed upon employees or the union in initiating the grievance or in carrying it to the next higher step in the contractual procedure.

The Court, however, does find the grievance-arbitration procedure to be mandatory to the extent that the union must settle grievances through these provisions of the contract rather than use economic force. In other words, the union is limited to this single remedy if they do not wish to accept management's response to their grievance. The contract provides in addition to the permissive or "may" clauses, some very important mandatory or "shall" clauses.

1. "An employee or group of employees who take exceptions to any work instruction or written notice *shall* rely upon regular grievance procedure for relief from an inequity claimed." (Art. VII, Section 2 of Contract)

2. "It is the intent of both parties that misunderstandings be avoided and that all procedures shall be just, fair and equitable.

To that end, it is agreed that mutual understandings to be effective shall be in writing and regular griev-

ance procedure *shall* be followed." (Art. VII, Section 1 of Contract)

After this determination that there is a mandatory grievance-arbitration provision in the contract, the Court must also find that this *particular* grievance is subject to the grievance-arbitration machinery. The plaintiff presents a strong case that the written contract on its face contemplates submitting work standards to arbitration.

The contract provides as follows:

1. "The intention is that the practice shall be that major changes in the work or working conditions of individuals will be, and in any event changes effecting (sic) groups or departments shall be, except in cases of emergency, effectuated by no less than one week's written notice to the bargaining committee. If there is objection to such proposed changes, a grievance must be entered within three days of the notice to the bargaining committee, and, thereafter, *regular grievance procedure shall be followed with respect to that question.*"[6]

(Emphasis added).

2. "An employee or group of employees who take exception to any work instruction or written notice *shall rely upon regular grievance procedure* for relief from an inequity claimed."[7]

(Emphasis added)

3. "Whenever any departments are unable to arrive at a satisfactory disposition of their production schedules through regular grievance procedure prior to resorting to arbitration, they may determine within the period of time established for submitting a matter to arbitration whether they desire to submit such question to arbitration or go on an hourly basis."[8]

5. Page 7, "Memorandum of Defendants in Support of Motion to Dismiss Complaint," filed September 21, 1972.

6. Article IX, Section 4, *supra*, note 2.

7. Article VII, Section 2, *supra*, note 2.

8. Page 37, Memo 42, *supra*, note 2.

■ The above provisions of the contract establish that this is a broad grievance-arbitration agreement that on its face would encompass a dispute over work standards.

■ The defendants make two main arguments that assert work standards are not subject to arbitration. First, the union points out that work standards determine incentive pay and ultimately the potential income of a worker. This, the union argues, is "interest" arbitration. The union contends that just as they have not agreed to "interest" arbitration of wage rates, there is also no agreement to submit to "interest" arbitration of work standards. The defendants' argument is not supported, however, by Art. II, Section 2, of the contract which states:

"Incentive pay, overtime or other forms of additional compensation attached to the employee's job will be specified in the work schedules or work budgets. Accurate methods of job load appraisal will be invoked to determine the relative equality of various department schedules."

Although standards will determine incentive pay, this above provision of the contract implies these are "accurate methods" to determine job loads. These accurate methods do not imply to the Court "negotiation." This is not "interest" arbitration although the standard that is arrived at will surely affect the pay of the employees.

Secondly, the defendants argue without contradiction that in the past history of negotiations at this plant, a standard has never been taken to arbitration. The union argues that this fact indicates that the parties did not intend to arbitrate standards. This contention of the union has caused much concern to the Court. The question presented to the Court is whether this past history under the contract should nullify contract language which seems to put this grievance within grievance-arbitration provisions of said contract. The present contract has been in effect since 1953 with amendments and at no time have standards heretofore been arbitrated. The length of this contract period is in itself unique and indicates some special deference to past negotiating history might be required.

The case law, however, does not allow this Court to pay undue deference to this past negotiating history. The United States Supreme Court in United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 80 S. Ct. 1347, 4 L.Ed.2d 1409 (1960) interpreted a broad grievance-arbitration provision as follows:

"An order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible to an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage." 363 U.S. at 582–583, 80 S.Ct. at 1353.

This case would seem to indicate to the Court that if the contract could be interpreted to include standards as subject to the grievance-arbitration clause, the Court should do so. This presumption for arbitrability, however, was somewhat modified by Boys Markets, Inc. v. Retail Clerk's, Union, Local 770, *supra*, in the situation where an injunction is sought to enforce an express or implied no-strike clause.

"When a strike is sought to be enjoined because it is over a grievance which both parties are contractually bound to arbitrate, the District Court may issue no injunctive order until it first holds that the contract *does* have that effect . . . ." 398 U.S. at 254, 90 S.Ct. at 1594.

This statement indicates that this Court should make a careful examination of arbitrability, but it does not mean there still should not be some deference to arbitration as an appropriation method for settling industrial disputes.

There has been a split among the Circuits as to whether past negotiating history should be used to determine wheth-

er a type of grievance was intended to be arbitrable under a contract. The following line of cases would exclude evidence of bargaining history that shows the parties intended to exclude the disputed matter from arbitration. International Union of Elec., Radio and Machine Workers, AFL–CIO v. General Electric Co., 332 F.2d 485 (2nd Cir. 1964); Local 719, American Bakery and Confectionery Workers v. National Biscuit Co., 378 F.2d 918 (3rd Cir. 1967); Association of Westinghouse Salaried Emp. v. Westinghouse Elec. Corp., 283 F.2d 93 (3rd Cir. 1960); A. S. Abell Co. v. Baltimore Typographical Union No. 12, 338 F.2d 190 (4th Cir. 1964). The following cases to the contrary would admit this type of evidence to construe the contract: Pacific Northwest Bell Telephone v. Communications Workers, 310 F.2d 244 (9th Cir. 1962) and Independent Petroleum Workers v. American Oil, 324 F.2d 903 (7th Cir. 1963).

The foregoing lines of cases really go to the weight to be given to the presumption for arbitrability. A favorable view of the Eighth Circuit towards the presumption of arbitrability was expressed in United Brick & Clay Workers v. A. P. Green Fire Brick Co., 343 F.2d 590 (8th Cir. 1965) where a broad arbitration clause was held to require arbitration of the dispute.

Local 719 etc. v. National Biscuit Co., *supra,* contains a factual situation similar to the instant case. The union contested the arbitrability of a dispute over increases in production required by the company in the shipping department on the basis that this exceeded a "fair days work." The union argued that the phrase in the arbitration clause, "changes in methods of manufacturing or increases in production" that are challenged as exceeding a "fair days work" are to be resolved in final phase by submission to an arbitrator, did not encompass increases in output for the shipping department. The union also argued that the bargaining history, even if the dispute might fall within the arbitration clause taken on its face, indicates the parties intended to exclude this type of dispute from arbitration. The Third Circuit found in rejecting the union's arguments that the evidence of past history under the contract was "merely grievance history. As such it is obvious that the Union's proffer fails to meet the standard of forceful evidence of unambiguous purpose to exclude the issue from arbitration.[9]" 378 F.2d at 923.

■ The Court likewise does not find the past history under this contract to be conclusive that the contract did not contemplate arbitration of this type of grievance. The presumption in favor of arbitration for resolution of industrial disputes should apply in this case.

■ As to relief to be granted, the plaintiff prays for a preliminary injunction to restrain the union and other defendants from "causing or taking part in any strike, work stoppage, work slowdown, refusal to work at established work levels or interference which will interrupt or interfere with the plaintiff's operations." The contract, however, does not have a specific no-strike clause. The United States Supreme Court in Local 174, Teamsters, Chauffeurs, Warehousemen & Helpers v. Lucas Flour Co., 369 U.S. 95, 82 S.Ct. 571, 7 L.Ed.2d 593 (1962) held that a union violated a collective bargaining agreement by engaging in a work stoppage over a grievance when the agreement contained a mandatory grievance procedure terminating in final and binding arbitration even though there was not a no-strike clause. A no-strike clause can be implied from the mandatory grievance-arbitration procedure. Bethlehem

9. United Steelworkers of America v. Warrior & Gulf Navigation Co., *supra*; Communications Workers of America v. Pacific Northwest Bell Telephone, 337 F.2d 455, 459 (9th Cir. 1964); Acme Markets, Inc. v. Retail Clerks Int'l. Union, Local 1357, 235 F.Supp. 814 (E.D.Pa.1964) aff'd. per curiam 344 F.2d 330 (3rd Cir. 1965).

Mines Corp. v. United Mine Workers, 340 F.Supp. 829 (W.D.Pa.1972); Old Ben Coal Corp. v. Local Union No. 1487 U.M.W. Local 1487, 457 F.2d 162 (7th Cir. 1972), and Stein Printing Co. v. Atlanta Typographical Union No. 48, 329 F.Supp. 754 (N.D.Ga.1971) have followed *Lucas Flour* in implying a no-strike clause from a mandatory grievance-arbitration provision. The Court finds an implied no-strike clause in this instance.

 The last finding required by *Boys Markets* is that issuance of an injunction would be warranted under ordinary principles of equity. Breaches of the contract have occurred in that the hog cut gang has refused to work at established work levels. The Court finds, however, that the union was in "good faith" belief that they were not required to pursue this grievance through the grievance-arbitration machinery of the contract. The Court also finds that the Company did not make all the efforts it could to mitigate damages as exhibited by their refusal to allow the workers to work at the old standard pending resolution of this dispute. In the balance the Court finds that the continued refusal of the union to work at established work levels will cause irreparable injury to the employer. The employer will suffer more from denial of an injunction than will the union from its issuance. The union will be paid back incentive pay if the new standard is found to be incorrect. The employer, however, is limited in his remedies if the employees continue to be suspended for refusing to work at established work levels and refuse to return to work at the new standard. The employer would continue to be damaged even if the employees returned to work at the old standard if it were eventually found that a higher standard was required.

The Court in fashioning injunctive relief is mindful that the parties cannot be enjoined to do more than agreed to in the express and implied provisions of the contract. This Court finds the de-fendants must resolve their grievance through the grievance-arbitration machinery of the contract *if* they do not wish to accept the new standard set for the hog cut floor.

It is hereby ordered that defendants are preliminarily enjoined from causing or taking part in any strike, work stoppage, work slowdown, refusal to work at established work levels relating to standards for the hog cut floor. Plaintiff is affirmatively ordered to arbitrate Grievance 702 and related grievances concerning hog cut standards if and when the union proceeds to this step of the grievance-arbitration procedure.

It is further ordered that plaintiff post bond in the sum of $10,000.00.