# CARBON FUEL CO. *v.* UNITED MINE WORKERS OF AMERICA ET AL.

No. 78–1183.  Argued November 5, 1979—Decided December 10, 1979

BRENNAN, J., delivered the opinion for a unanimous Court.

*David D. Johnson* argued the cause for petitioner. With him on the briefs were *Forrest H. Roles* and *Larry L. Roller.*

*Harrison Combs* argued the cause for respondents. With him on the brief were *Richard L. Trumka, James M. Haviland, Isaac N. Groner,* and *Walter H. Fleischer.*\*

MR. JUSTICE BRENNAN delivered the opinion of the Court.

The question for decision in this case is whether an international union, which neither instigates, supports, ratifies, nor encourages "wildcat" strikes engaged in by local unions in violation of a collective-bargaining agreement, may be held liable in damages to an affected employer if the union did not use all reasonable means available to it to prevent the strikes or bring about their termination.

Petitioner, Carbon Fuel Co., and respondent United Mine Workers of America (UMWA) were parties to the National Bituminous Coal Wage Agreements of 1968 and 1971, collective-bargaining agreements covering, *inter alia,* workers at petitioner's several coal mines in southern West Virginia. Forty-eight unauthorized or "wildcat" strikes were engaged in by three local unions at petitioner's mines from 1969 to 1973. Efforts of District 17, a regional subdivision of UMWA, to

---

\*Briefs of *amici curiae* urging reversal were filed by *Leonard L. Scheinholtz* for the Bituminous Coal Operators' Association, Inc.; by *Vincent J. Apruzzese* and *Stephen A. Bokat* for the Chamber of Commerce of the United States; and by *Daniel J. Popeo* and *Paul D. Kamenar* for the Washington Legal Foundation.

Briefs of *amici curiae* urging affirmance were filed by *J. Albert Woll* and *Laurence Gold* for the American Federation of Labor and Congress of Industrial Organizations; and by *William Tomar* for the Glass Bottle Blowers Association of the United States and Canada, AFL–CIO.

persuade the miners not to strike and to return to work were uniformly unsuccessful.[1]

Petitioner brought this suit pursuant to § 301 of the Labor Management Relations Act, 1947 (Taft-Hartley Act), 61 Stat. 156, 29 U. S. C. § 185, in the District Court for the Southern District of West Virginia. UMWA, District 17, and the three local unions were named defendants. The complaint sought injunctive relief [2] and damages, alleging that the strikes were in violation of the two collective-bargaining agreements. The case was tried before a jury. The trial judge found as a matter of law that the strikes violated the agreements. The trial judge also instructed the jury, over objection of UMWA and District 17, that those defendants might be found liable in damages to petitioner "[i]f you find from a preponderance of the evidence that the International and District Unions did not use all of the reasonable means available to them to prevent work stoppages or strikes from occurring in violation of the contract, or to terminate any such work stoppages or strikes after they began. . . ." App. 197a. Verdicts in different amounts were returned against UMWA, District 17, and the three local unions.

---

[1] The facts relevant to the participation of the District and International in the wildcat strikes can be briefly stated. As recently as 1966 the International expressed its intention to discipline "wildcatters." The District and International were promptly notified of each strike. In each instance a District representative arranged for a meeting of the striking local and directed the members to return to work. Often the representative advised the members that the International and the District could take disciplinary action against participants in illegal, unauthorized strikes. If the strike did not end after the first meeting a second meeting was called. Most strikes ended in the first one or two days. No strike lasted longer than six days. From concern that such action might only aggravate a bad situation, no disciplinary action was taken against the strikers. There is however no suggestion that the District's efforts to end the strikes were not in good faith.

[2] The contracts have expired, and the question of injunctive relief is out of the case.

On appeal, the Court of Appeals for the Fourth Circuit vacated in part the judgments against the three local unions but otherwise affirmed those judgments.[3] However, the Court of Appeals vacated the judgments against UMWA and District 17, and remanded to the District Court with directions to dismiss the case against those defendants. 582 F. 2d 1346 (1978). The court held that this result was required by its earlier decision in *United Construction Workers* v. *Haislip Baking Co.*, 223 F. 2d 872 (1955). 582 F. 2d, at 1351. *Haislip* held as follows, 223 F. 2d, at 877–878:

> "We have never held . . . that there is any responsibility on the part of a union for a strike with which it has had nothing to do; and there manifestly is no such liability. If [UMWA or District 17] had done nothing when [petitioner] called on them to help get the men back to work, there would have been no liability on the part of [UMWA or District 17]. This being true, defendants were not rendered liable by the efforts which [District 17] made to bring about an adjustment of the difficulty, even if they did not do everything that they might have done to that end. The question is not whether they did everything they might have done, but whether they adopted, encouraged or prolonged the continuance of the strike. There is no evidence of any sort that they did."

The Court of Appeals recognized that its conclusion was in conflict with the holding of the Court of Appeals for the Third Circuit in *Eazor Express, Inc.* v. *International Brotherhood of Teamsters*, 520 F. 2d 951 (1975) (union liable under no-strike clause for failure to use best efforts to end unauthorized strikes).[4] We granted certiorari to resolve the conflict. 440 U. S. 957 (1979). We affirm.

---

[3] Review of the judgments against the locals was not sought here.

[4] Accord, *Republic Steel Corp.* v. *UMWA*, 570 F. 2d 467 (CA3 1978); *Bituminous Coal Operators* v. *UMWA*, 585 F. 2d 586 (CA3 1978); *United States Steel Corp.* v. *UMWA*, 534 F. 2d 1063 (CA3 1976); *Wagner Elec.*

Petitioner argues that the obligation of UMWA and District 17 to use all reasonable means to prevent and end unauthorized strikes in violation of the collective-bargaining agreement is either (a) implied in law because the agreement contains an arbitration provision or (b) in any event is to be implied from the provision of the agreement that the parties "agree and affirm that they will maintain the integrity of this contract. . . ." We find no merit in either argument.

## A

Insofar as petitioner's argument relies on the history of § 301 and the congressional plan to prevent and remedy strikes in breach of contract by encouraging arbitration, the legislative history is clear that Congress limited the responsibility of unions for strikes in breach of contract to cases when the union may be found responsible according to the common-law rule of agency.[5]

Section 301 (a) makes collective-bargaining agreements judicially enforceable. *Textile Workers* v. *Lincoln Mills,* 353 U. S. 448 (1957). At the same time, Congress gave careful attention to the problem of strikes during the term of a collective-bargaining agreement, but stopped short of imposing liability upon a union for strikes not authorized, participated in, or ratified by it. Rather, to effectuate § 301 (a), the Taft-Hartley Act provided in § 301 (b) that a union "shall be

*Corp.* v. *Local 1104, Electrical Workers,* 496 F. 2d 954 (CA8 1974). Contra, *Southern Ohio Coal Co.* v. *UMWA,* 551 F. 2d 695 (CA6 1977).

[5] An international union, of course, is responsible under § 301 for any authorized strike if such strike violates any term of the contract, whether express or implied. See, *e. g., Gateway Coal Co.* v. *Mine Workers,* 414 U. S. 368 (1974); *Boys Markets, Inc.* v. *Retail Clerks,* 398 U. S. 235 (1970). Our holding in Part A of this opinion does not affect the *content,* as implied by law, of arbitration clauses. Rather, we are addressing the wholly different issue of whether an international or district union may be held legally responsible for locals' unilateral actions which are concededly in violation of the locals' responsibilities under the contract.

bound by the acts of its agents," and in § 301 (e) provided that the common law of agency shall govern "in determining whether any person is acting as an 'agent' of another person." In explaining § 301 (e) Senator Taft stated, 93 Cong. Rec. 4022 (1947):

> "If the wife of a man who is working at a plant receives a lot of telephone messages, very likely it cannot be proved that they came from the union. *There is no case then. There must be legal proof of agency in the case of unions as in the case of corporations. . . ."* (Emphasis supplied.)

Congress' reason for adopting the common-law agency test, and applying to unions the common-law doctrine of *respondeat superior,* follows the lead of Mr. Chief Justice Taft in *Coronado Coal Co.* v. *Mine Workers,* 268 U. S. 295, 304 (1925), that to find the union liable "it must be clearly shown . . . that what was done was done by their agents in accordance with their fundamental agreement of association." The common-law agency test replaced the very loose test of responsibility incorporated in § 2 (2) of the original 1935 National Labor Relations Act under which the term "employer" included "any person acting in the interest of an employer. . . ." 49 Stat. 450.[6]

Petitioner makes the distinct argument that we should hold the International liable for its *own* failure to respond to the locals' strike. In the face of Congress' clear statement of the limits of an international union's legal responsibility for the acts of one of its local unions, it would be anomalous to hold that an international is nonetheless liable for its failure to take

---

[6] At the same time, Congress applied to unions the common-law doctrine of *respondeat superior* rather than the more restrictive test of union responsibility under § 6 of the Norris-LaGuardia Act, which requires "clear proof of *actual* participation in, or *actual* authorization of, such acts, or of ratification of such acts after *actual* knowledge thereof." 29 U. S. C. § 106 (emphasis supplied).

certain steps in response to actions of the local. Such a rule would pierce the shield that Congress took such care to construct. Accordingly, we reject petitioner's suggestion that Congress' policy in favor of arbitration extends to imposing an obligation on the respondents, which agreed to arbitrate grievances, to use reasonable means to try to control the locals' actions in contravention of that agreement.

The Court of Appeals stated: "There was no evidence presented in the district court that either the District or International Union instigated, supported, ratified, or encouraged any of the work stoppages. . . ." 582 F. 2d, at 1351. Under Art. XVI, § 1, of the UMWA constitution, the local unions lacked authority to strike without authorization from UMWA. App. 195a. Moreover, UMWA had repeatedly expressed its opposition to wildcat strikes. Petitioner thus failed to prove agency as required by §§ 301 (b) and (e), and we therefore agree with the Court of Appeals that "under these circumstances it was error for the [District Court] to deny the motions of these defendants for directed verdicts." 582 F. 2d, at 1351.

## B

We turn next to petitioner's argument that even if the no-strike obligation to be implied from the promise to resolve disputes by arbitration did not carry with it the further step of implying an obligation on UMWA and District 17 to use all reasonable efforts to end an unauthorized strike, that obligation should nevertheless be implied from the contract provision obligating UMWA and District 17 to "maintain the integrity of this contract. . . ."

In the 1947 Taft-Hartley Act Congress sought to promote numerous policies. One policy of particular importance—if not the overriding one—was the policy of free collective bargaining. See *Teamsters* v. *Lucas Flour Co.,* 369 U. S. 95, 104 (1962); *NLRB* v. *Insurance Agents,* 361 U. S. 477, 488 (1960); *Textile Workers* v. *Lincoln Mills, supra,* at 453–454.

And to make crystal clear the intention to leave the parties entirely free of any Government compulsion to agree to a proposal, or even reach an agreement, Congress added § 8 (d) defining "to bargain collectively" as "not '[to] compel either party to agree to a proposal or require the making of a concession." 29 U. S. C. § 158 (d). See *Howard Johnson Co.* v. *Hotel Employees,* 417 U. S. 249, 254–255 (1974); *NLRB* v. *Burns Security Services,* 406 U. S. 272, 287 (1972); *H. K. Porter Co.* v. *NLRB,* 397 U. S. 99, 104–106 (1970); *NLRB* v. *Insurance Agents, supra,* at 488. It follows that the parties' agreement primarily determines their relationship. *Steelworkers* v. *Warrior & Gulf Navigation Co.,* 363 U. S. 574 (1960) (though policy in favor of arbitration may color interpretation of contract, it cannot impose an agreement to arbitrate where the parties have agreed not to arbitrate). See *Steelworkers* v. *American Manufacturing Co.,* 363 U. S. 564, 570 (1960) (BRENNAN, J., concurring). If the parties' agreement specifically resolves a particular issue, the courts cannot substitute a different resolution.

The contractual provision to which petitioner looks to create the alleged union duty to use "all reasonable means" to end wildcat strikes is the promise to "maintain the integrity of this contract." Petitioner argues that the promise, intended to get disputes into arbitration, is meaningless if the UMWA and District 17 have no obligation to exert their best efforts to force the miners to live up to the contracts.

The bargaining history of the contracts completely answers petitioner's argument. The parties directly addressed the issue early in their bargaining history and, after first including such an obligation, specifically deleted it from their agreement. The first agreement between the parties, in 1941, contained an explicit no-strike clause. In order to avoid liability under § 301 for contract breaches, UMWA negotiated the deletion of the no-strike provision from the 1947 contract. Instead, the coverage of the contract was limited to employees

"able and willing to work," and the parties agreed that all disagreements would be settled through arbitration or collective bargaining. In 1950 the contract was again rewritten. The "able and willing" provision was dropped and replaced by a promise "to maintain the integrity of this contract and *to exercise their best efforts through available disciplinary measures* to prevent stoppages of work by strike or lockout." (Emphasis supplied.) [7]

Because the union did not want to surrender its freedom to decide what measures to take or not to take in dealing with unauthorized strikes, it negotiated the deletion of the "best efforts through available disciplinary measures" clause. See *International Union, UMWA* v. *NLRB*, 103 U. S. App. D. C. 207, 212–213, 257 F. 2d 211, 216–217 (1958); *International Union, UMWA*, 117 N. L. R. B. 1095, 1118 (1957) (Intermediate Report of Trial Examiner, reprinted as an appendix to NLRB opinion). [8] The new provision in the 1952 contract,

---

[7] The full text of this new provision read:

"The United Mine Workers of America and the Operators signatory hereto affirm their intention to maintain the integrity of this contract and to exercise their best efforts through available disciplinary measures to prevent stoppages of work by strike or lockout pending adjustment or adjudication of disputes and grievances in the manner provided in this agreement."

[8] Contrary to petitioner's suggestion, the Trial Examiner's opinion, which was affirmed by the Labor Board but set aside by the Court of Appeals, does not present an inconsistent interpretation of the bargaining history on this point. Although the Trial Examiner gave more importance to the retention of the integrity clause than to the deletion of the best-efforts clause, he did so in the discrete context of deciding whether or not there was an implied agreement not to strike. The issue of what obligation, if any, the union owed to try to get the miners back to work was not before the Board. Consequently, the importance of the best-efforts language was properly minimized.

In fact, the Trial Examiner's interpretation of the contract appears to reject, rather than support, petitioner's suggested reading concerning the damages liability of UMWA for wildcat strikes. He stated that the contract and the bargaining history suggested that "the contracting parties may have intended that no breach of contract damage or other suits result-

which was carried forward into the 1968 and 1971 contracts essentially unchanged as to this issue, read as follows:

> "The United Mine Workers of America and the Operators agree and affirm that they will maintain the integrity of this contract and that all disputes and claims which are not settled by agreement shall be settled by the machinery provided in the 'Settlement of Local and District Disputes' section of the Agreement unless national in character in which event the parties shall settle such disputes by free collective bargaining as heretofore practiced in the industry, it being the purpose of this provision to provide for the settlement of all such disputes and claims through the machinery in this contract provided and by collective bargaining without recourse to the courts."

It makes no sense to assume that the parties thought the new language subsumed the deleted provision. Had that been their intention, there would have been no reason to alter the contract.

The inescapable conclusion to be drawn from their bargaining history is that, whatever the integrity clause may mean,[9] the parties purposely decided not to impose on the union an obligation to take disciplinary or other actions to get unauthorized strikers back to work. It would do violence to the bargaining process and the national policy furthering free collective bargaining to impose by judicial implication a duty upon UMWA and District 17 that the parties in

---

ing from strikes should be lodged in courts of law." 117 N. L. R. B., at 1115. This suit seeks damages in a court of law on the basis of a breach of contract resulting from a strike.

[9] We need not decide what content the "integrity" clause has since we have determined that it does not support petitioner's cause of action. The District of Columbia Circuit has suggested one possible meaning. *International Union, UMWA* v. *NLRB*, 103 U. S. App. D. C. 207, 214, 257 F. 2d 211, 218 (1958).

arm's-length bargaining first included and then purposely deleted.

Moreover, since the deletion but before 1968 or 1971 when these agreements were reached, two Courts of Appeals construed this contract as not imposing liability on the union for wildcat strikes and as not requiring UMWA to take any action with regard to such strikes. *Lewis* v. *Benedict Coal Corp.*, 259 F. 2d 346, 351 (CA6 1958) (Stewart, J.), aff'd by an equally divided Court, 361 U. S. 459, 464 (1960); *United Construction Workers* v. *Haislip Baking Co.*, 223 F. 2d, at 877.[10]  If these interpretations did not accord with the parties' understanding of their contract, they had ample opportunity to make their own understanding explicit.  Failure to do so strongly suggests the parties incorporated the courts' interpretation of the agreements.

*Affirmed.*

---

[10] Since 1971 the Seventh Circuit has adopted the same reading of this contract. *Old Ben Coal Corp.* v. *Local Union No. 1487, United Mine Workers*, 457 F. 2d 162, 164 (1972).  Only the Third Circuit has read this provision differently. *United States Steel Corp.* v. *UMWA*, 534 F. 2d, at 1072–1073.