The NEW YORK TIMES COMPANY, a New York Corporation, Plaintiff,

v.

NEWSPAPER AND MAIL DELIVERERS' UNION OF NEW YORK AND VICINITY; Douglas LaChance, individually and as President of the Newspaper and Mail Deliverers' Union; Lawrence May, individually and as Vice President of the Newspaper and Mail Deliverers' Union; and Monte Rosenberg, individually and as Business Agent of the Newspaper and Mail Deliverers' Union; and each of the individually named defendants as representatives of a class consisting of the officers, employees, agents, representatives and members of the Newspaper and Mail Deliverers' Union, Defendants.

No. 79 Civ. 5383.

United States District Court,
S. D. New York.

July 9, 1981.

Cahill, Gordon & Reindel by Joel C. Balsam, Richard Coll, New York City, for plaintiff The New York Times Co.

Shea & Gould by Kevin McGrath, Marshall Lippman, New York City, for defendants.

## OPINION

GRIESA, District Judge.

This is an action by The New York Times Company against the Newspaper and Mail Deliverers' Union of New York and Vicinity ("NMDU") and three officials of that union—Douglas LaChance, Lawrence May and Monte Rosenberg. The action arises out of the fact that the Times and NMDU are parties to a collective bargaining agreement that contains a no-strike clause, and a clause setting up a mechanism for handling grievances through arbitration. Under the arbitration procedure, either party can request rulings from the chairman of the arbitration panel, the so-called "Impartial Chairman," as to whether changes in particular working conditions alter the "status quo" under the contract. The case concluded with an Order and Judgment on Consent entered June 4, 1980.[1] In essence, the consent order required the NMDU to comply with any status quo ruling of the Impartial Chairman until and unless the ruling should be overturned by a higher authority in the arbitration procedure.

The Times seeks to have defendants found in contempt of the June 4, 1980 order because of certain events occurring on September 17, 1980, and to collect substantial damages based on the losses caused by the allegedly contemptuous conduct. The Times also requests the court to impose a prospective fine in order to deter future violations of the order.

The court holds that NMDU and also defendant Lawrence May were guilty of contempt of the June 4, 1980 consent order. No basis for a finding of contempt against defendants LaChance and Rosenberg has been shown. As to those defendants guilty of contempt, damages in the amount of $229,718 are assessed. The application for a prospective fine is denied.

### I.

At about 4:00 a.m. on September 17, 1980 Anthony Taddeo, an employee of the Times

1. The paragraphs of the June 4, 1980 order relevant to this motion are as follows:

ORDERED, ADJUDGED AND DECREED, that defendants and each of them, their officers, agents, representatives and employees, and all persons acting in concert or participation with them are permanently enjoined and restrained, from

(i) refusing to obey or comply with the "status quo" awards issued by the designated Impartial Chairman, whether or not such "status quo" proceedings were instituted by The Times and whether or not the NMDU refused or failed to participate therein, until such time as the Joint Standing Committee or the Appeals Board should hear and make a determination negating or modifying the effect of any such award; and

(ii) causing, directing, ordering, inducing, encouraging or authorizing members of the NMDU employed by The Times in the production, printing and distribution of plaintiff's newspaper, or any of them, to refuse to obey or comply with such "status quo" awards until such time as the Joint Standing Committee or the Appeals Board should hear and make a determination negating or modifying the effect of any such award; and it is further

ORDERED, ADJUDGED AND DECREED, that defendants, and each of them, their officers, agents, representatives and employees, and all persons acting in concert or participation with them, are permanently enjoined and restrained from taking any action or actions designed or intended to defy, frustrate, or subvert the relief herein provided....

and an NMDU member and chapel chairman (shop steward), was suspended from work at the Times plant at Carlstadt, New Jersey. As news of this suspension spread, other NMDU members at the Carlstadt plant and at the Times plant on West 43rd Street, New York City, stopped work.

Almost immediately Howard Bishow, director of industrial relations for the Times, placed a call from the 43rd Street plant to Impartial Chairman Maurice Benewitz and informed him of the situation. Benewitz asked to speak to an NMDU official. Bernard Weisner, an NMDU chapel chairman at 43rd Street, then spoke with Benewitz who told Weisner to have an official of the NMDU call him (Benewitz) or he would have Weisner convey a ruling to the union members.

Fifteen minutes later (4:20 or 4:25 a.m.) Benewitz called 43rd Street and asked to speak to Weisner. No union official had yet called Benewitz. At that time Weisner was speaking with NMDU vice-president May. When Weisner went to speak with Benewitz, Bishow spoke with May. May said the substantive dispute involving Taddeo could be resolved later and that the NMDU members would return to work if Taddeo were immediately reinstated. Bishow replied that the NMDU's use of self-help in a grievance situation was troublesome to the Times, and that the Times desired to work out the problem through the grievance machinery. Bishow then suggested that May call Benewitz and May said he would do so. Bishow gave Benewitz's telephone number to May. May did not call Benewitz.

Benewitz announced to Weisner on the telephone that he ruled in favor of the Times—that the suspension of Taddeo was not a violation of the status quo, and that the union members should return to work. Bishow spoke with Benewitz, was notified of the status quo ruling, and proceeded to inform other persons at the Times.

At 4:30 a. m. Weisner told the NMDU members at 43rd Street that Benewitz had issued a ruling and he urged them to go back to work in accordance with the ruling.

The NMDU members refused to return to work unless Taddeo was reinstated. Weisner communicated this to Times foreman Luke Murphy.

Fifteen minutes later (4:45 or 4:50 a. m.) Murphy came to where the NMDU members were gathered. Murphy stated that the men had five minutes to come back to work, or the Times would shut its doors. The men did not return to work. The Times closed its doors and members of other craft unions started leaving the 43rd Street plant. The Times presses at 43rd Street were shut down at 5:01 a. m.

Murphy had telephoned Vinnie Savarese, foreman of the Times Carlstadt plant, around 4:45 a. m. advising Savarese of the Benewitz ruling. Savarese communicated this information to the NMDU members who had walked out at Carlstadt.

Shortly before 5:00 a. m. NMDU business agent Joseph Miraglia arrived at Carlstadt. Informed of the problem, Miraglia telephoned Murphy and was informed of the Benewitz ruling. Miraglia did not order the men to return to work. He merely ordered them to deliver those papers already loaded into the trucks, and told the rest of the men to go home. The presses at Carlstadt were shut down at 5:01 a. m.

NMDU vice-president May was observed at the Times cafeteria on 43rd Street at about 5:45 a. m. As already stated, Bishow of the Times had spoken to May on the telephone about the problem at around 4:20 or 4:25 a. m., and had asked May to call Benewitz, which May had not done. There is no direct evidence that May learned of the Benewitz ruling. However, the inevitable conclusion to be drawn from the circumstances is that May either learned of the ruling or intentionally avoided learning of it. Clearly May acted with the purpose of thwarting the arbitration procedure and the court order of June 4, 1980.

NMDU business agent Miraglia acted in defiance of the Benewitz status quo ruling and of the June 4, 1980 court order by virtue of his failure to advise the NMDU members at Carlstadt of their obligation to return to work.

As to the NMDU members at both 43rd Street and Carlstadt, they were advised of the Benewitz ruling, and nevertheless refused to return to work.

As stated earlier, the Times shut down its presses at both 43rd Street and Carlstadt at 5:01 a. m. The evidence demonstrates that this resulted from the fact that the NMDU members had walked out, and were not returning to work despite the Benewitz ruling. The NMDU members were responsible for loading printed papers into trucks for distribution. The Times acted reasonably to discontinue its production at that point. The Times obviously sought to avoid further production of papers which would not be delivered.

The total print order for the Times of September 17 was 970,496 copies. This represents the total number of newspapers which were scheduled to be distributed that day. The number of newspapers not printed because of the cessation of production was 258,000. An additional number of newspapers had been printed but could not be distributed. The total shortfall distribution of newspapers due to the NMDU work stoppage was 306,000.

On the morning of September 17, the comptroller of the Times and certain other executives analyzed the effects of the reduced distribution for that day, and authorized a 33% across the board credit to Times advertisers. The evidence shows that the general practice of the Times was to grant credits to advertisers whenever distribution fell 10% or more below the schedule. In this case the lost distribution was more than 25%. The amount of the across the board credit was $240,721. Additional credits to major advertisers were authorized, bringing the total credits to $248,791. The loss in circulation revenue was $47,209.

These losses must be offset by the amount of $66,280 representing the cost of newsprint and ink saved by not printing the 258,000 newspapers.

The net damages to the Times amount to $229,718.

## II.

Both the union and its officials were bound by the order of June 4, 1980 and were obligated to take the necessary steps to comply with this order. *N.L.R.B. v. Sequoia District Council of Carpenters*, 568 F.2d 628, 633 (9th Cir. 1977); *Palmigiano v. Garrahy*, 448 F.Supp. 659, 670 (D.R.I.1978). *See also Backo v. Local 281*, 438 F.2d 176, 180 (2d Cir. 1970), *cert. denied*, 404 U.S. 858, 92 S.Ct. 110, 30 L.Ed.2d 99 (1971).

Although defendant May, a senior officer of the union, was in a position to step in and exert his authority to obtain the union members' compliance with the court order, he willfully refrained from doing so. Defendant May is in contempt of court.

There is no evidence of any personal involvement or dereliction on the part of either defendant LaChance or defendant Rosenberg, and the motion to hold these defendants in contempt is denied.

The union members failed to return to work after they were notified of the Benewitz ruling, and it would appear that this would mean that the defendant union is in contempt. The union appears to argue that the actions of the members constituted a spontaneous "wildcat" work stoppage, not authorized by the union management, and that therefore the union has no contempt liability. The union argues that its position is supported by *Carbon Fuel Co. v. United Mine Workers of America*, 444 U.S. 212, 100 S.Ct. 410, 62 L.Ed.2d 394 (1979).

The union's position is without merit. It is true that chapel chairman Weisner told the NMDU members at 43rd Street that they should return to work. However, Weisner was not an officer of the union. His authority over the men was obviously minimal. NMDU vice-president May in a real sense aided and abetted the work stoppage by purposefully avoiding taking any step to see that his men complied with the Benewitz ruling. At Carlstadt, another union officer, business agent Miraglia, took the affirmative action of ordering union members to go home. Thus it cannot be said that the union management played no role in the work stoppage.

In any event, however, the actions of the union members themselves require a finding of contempt liability against the union. The cases clearly hold that mass action by union members is sufficient to subject the union to liability. *Eazor Express Inc. v. International Bro. of Teamsters*, 520 F.2d 951, 963 (3d Cir. 1975), *cert. denied*, 424 U.S. 935, 96 S.Ct. 1149, 47 L.Ed.2d 342, *reh. denied*, 425 U.S. 908, 96 S.Ct. 1502, 47 L.Ed.2d 758 (1976); *Danielson v. United Seafood Workers Smoked Fish and Cannery Union Local 359*, 405 F.Supp. 396 (S.D.N.Y. 1975). *Carbon Fuel Co. v. United Mine Workers of America, supra*, is not to the contrary. It simply holds that action by members of a local union does not necessarily subject the *international* to liability. The Fourth Circuit had affirmed a finding of liability against the local union on the basis of the mass action theory, *Carbon Fuel Co. v. United Mine Workers of America*, 582 F.2d 1346 (4th Cir. 1978), and no review of this ruling was sought in the Supreme Court. *See* 444 U.S. at 215 n.3, 100 S.Ct. at 413 n.3.

For these reasons, the defendant union should be adjudged in contempt of court for disobedience to the order of June 4, 1980.

■ In a civil contempt proceeding the plaintiff is entitled to recover compensatory damages, once he has proved the actions constituting contempt and has further proved the damages resulting from such actions. *Vuitton et Fils S.A. v. Carousel Handbags*, 592 F.2d 126, 130 (2d Cir. 1979). On the basis of the findings already made regarding damages, plaintiff is entitled to recover the sum of $229,718 against the union and defendant May.

■ Plaintiff has requested the court to enter an order providing that, for every future violation of the June 4, 1980 order, defendants will be fined $100,000 per day for as long as the violation continues. There is authority for imposing such prospective fines. *Sunbeam Corp. v. Golden Rule Appliance Co.*, 252 F.2d 467, 471, 472 (2d Cir. 1958); *N.L.R.B. v. Teamsters, Chauffeurs, Helpers, etc.*, 592 F.2d 921 (6th Cir. 1979); *N.L.R.B. v. Truck Drivers &*

*Helpers, Local Union 676*, 450 F.2d 413 (3d Cir. 1971). However, it appears that such prospective fines are the exception rather than the rule. In the present case a prospective fine would be inappropriate. New union leadership was elected in September 1980, and no problems have been brought to the attention of the court since the incident of September 17, which is the subject of the contempt motion presently being decided.

### Conclusion

Plaintiff's application to have defendant Newspaper and Mail Deliverers' Union of New York and Vicinity and defendant Lawrence May adjudged in contempt for violation of the June 4, 1980 order is granted. Plaintiff's application to have defendants Douglas LaChance and Monte Rosenberg adjudged in contempt is denied. Plaintiff is entitled to judgment against defendants NMDU and May in the amount of $229,718. The application for a prospective fine is denied.

Settle judgment.