SEATTLE TIMES CO., a Delaware corporation, Plaintiff-Appellee,

v.

SEATTLE MAILER'S UNION NO. 32; Gordon F. Betts, its president; John J. Droge, its vice-president; Ronald H. Duke, its secretary-treasurer; Clarence R. Wakefield, its chapel chairman; and all accounts and members in active concert or participating with the above-named defendants, Defendants-Appellants.

CA No. 80–3405.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 5, 1981.

Decided Jan. 4, 1982.

Robert A. Blackstone, Davis, Wright, Todd, Riese & Jones, Seattle, Wash., for plaintiff-appellee.

William A. Roberts, Vance, Davies, Roberts, Reid & Anderson, Seattle, Wash., for defendants-appellants.

Before HUG and FARRIS, Circuit Judges, and TAYLOR,* District Judge.

* Honorable Fred M. Taylor, Senior United States District Judge for the District of Idaho, sitting by designation.

FARRIS, Circuit Judge:

## I. BACKGROUND

The Seattle Times Company initiated this action against the Seattle Mailer's Union for damages alleging a work slowdown in breach of their collective bargaining agreement. The Union appeals the judgment for the Times.

After the Seattle Times installed new machinery to help assemble the Sunday edition's "color book" (comprised of the comics, T.V. guide, ad supplements, and magazines) it determined that it no longer needed a Wednesday evening sixth shift of workers paid at overtime wages. The Union was notified. For three of the four weeks following elimination of the Wednesday evening shift, production dropped dramatically. The Times concluded that the employees were engaged in a deliberate slowdown. In order to get the color book ready for the Sunday paper publication deadline, the Times hired additional workers at overtime wages and thereafter sought and obtained a temporary restraining order prohibiting the Union and its employees from taking further actions designed to delay production. At the same time, an order was entered to show cause why a preliminary injunction should not be issued. The preliminary injunction was heard before Judge Sharp who made several findings and denied the preliminary injunction, because production levels returned to normal after the TRO was issued and further problems were not anticipated. The Times then brought this action for damages under § 301 of the Labor Management Relations Act, 29 U.S.C. § 185 (1976), to recover overtime wages paid and attorney's fees incurred in obtaining the TRO.

Judge West heard the action for damages and based his findings in part on new evidence and in part on Judge Sharp's findings. He found there was a slowdown which the Union had encouraged, and awarded the Times damages of $26,068.96 for the overtime wages paid and $2,925.00

for the attorney's fees incurred in obtaining the TRO. The Union appeals.

We reverse that part of the damages award which represent attorney's fees, but affirm the award for overtime wages plus interest, which we modify to correct the arithmetic computations.

## II. ANALYSIS

### A. THE IMPLIED PROHIBITION AGAINST SLOWDOWNS

■ The trial court's finding that the employees engaged in a work slowdown is not clearly erroneous. The court had before it evidence of a decline in production, an unexplained number of equipment shutdowns, and the overloading and improper loading of the machines.

■ A no-strike clause is implied in collective bargaining agreements which contain a compulsory arbitration clause. *Local 174, Teamsters v. Lucas Flour Co.*, 369 U.S. 95, 105–06, 82 S.Ct. 571, 577–78, 7 L.Ed.2d 593 (1962). "[A] no-strike obligation, express or implied, is the *quid pro quo* for an undertaking by the employer to submit grievance disputes to the process of arbitration." *Boys Market, Inc. v. Retail Clerks Union, Local 770*, 398 U.S. 235, 248, 90 S.Ct. 1583, 1591, 26 L.Ed.2d 199 (1970). Under the terms of the contract, the Union's grievance here, involving the discharge of employees, was to be referred to the special standing committee (arbitration panel) for a "final and binding" decision.[1]

■ The Union argues that the implied no-strike clause should not also prohibit slowdowns. We reject the argument. "The term 'strike' includes . . . any concerted slowdown or other concerted interruption of operations by employees." Labor Management Relations Act § 501, 29 U.S.C. § 142(2) (1976). *Cf. Geo. A. Hormel & Co. v. Local Union No. P–31, Amalgamated Meat Cutter and Butcher Workmen*, 349 F.Supp. 785, 791–92 (N.D.Iowa 1972) (a pro-

---

1. Although the collective bargaining agreement calls for arbitration, neither party requested it or argued the point on appeal, though invited by the court to do so. We therefore assume it was waived.

hibition against slowdowns was included in an injunction, as part of the union's implied no-strike obligation arising out of a mandatory arbitration clause). We are aware of the contrary decision in *Jessop Steel Co. v. United Steelworkers of America*, 428 F.Supp. 172, 175–76 (W.D.Pa.1977), but decline to follow it.

## B. THE UNION'S LIABILITY FOR THE SLOWDOWN

■ The slowdown, if encouraged by the Union, was a violation of their implied contractual obligation. Even if Judge West based his decision upon a misinterpretation of the collective bargaining agreement by Judge Sharp, we need not address that contention or the claim that the Union is liable under the mass action or concerted action theory of liability, because there is ample evidence in the record to support a finding that the Union is liable under the agency theory articulated in *Carbon Fuel Co. v. United Mine Workers of America*, 444 U.S. 212, 100 S.Ct. 410, 62 L.Ed.2d 394 (1979).[2] In *Carbon Fuel*, at 217–18, 100 S.Ct. at 414, the Supreme Court held that an international union could not be liable for the acts of its local union where it did not instigate, support, ratify, or encourage an unauthorized strike. The Court specifically held that the international or district union had no duty to prevent illegal strikes. 444 U.S. at 216, 100 S.Ct. at 413.

The Union argues that the evidence is insufficient to hold it responsible under *Carbon Fuel*'s agency theory. We recognize that the record does not establish that the Union initiated the slowdown. However, the evidence is sufficient for a trier of fact to properly conclude that the Union ratified or authorized the slowdown:

> Strike encouragement sometimes is explicit, but more often is cryptic. A union may employ subtle signs to convey the message to strike. One court noted that unions sometimes employ "a nod or a

**2.** When reviewing the district court's decision, we must affirm if the result is correct, even if the trial court relied on a wrong ground or gave a wrong reason. *Helvering v. Gowran*, 302

wink or a code . . . in place of the word 'strike.' "
*Complete Auto Transit, Inc. v. Reis*, 451 U.S. 401, 418 n.1, 101 S.Ct. 1836, 1846 n.1, 68 L.Ed.2d 248 (1981) (Justice Powell concurring) (cited cases omitted).

■ Although less than overwhelming, the evidence of ratification or endorsement is sufficient to support the finding of Union responsibility. As Justice Powell stated, *id.* 451 U.S. at 423, 101 S.Ct. at 1848, "It is a foolish union that would invite a damages suit by explicitly endorsing a strike." The evidence before the court that the Union supported, ratified, or encouraged the slowdown included: 1) a statement from the Union's "chapel chairman" (shop steward) to the Times' vice president and labor relations manager that because of the elimination of the sixth shift "there is going to be trouble, you're taking away our incentives;" 2) a Union official's request that a Times' supervisor "stop harassing the troops" when the supervisor reprimanded an employee for causing the machine to jam by improperly loading it; 3) a subtle "message" received by the Times' vice president and labor relations manager from the Union's vice president when a machine stopped operating immediately after that Union official walked over to it; 4) the Union's continual denial that a slowdown was taking place; and 5) the immediate effect the TRO had on restoring production to its normal level.

## C. THE TIMES' DUTY TO MITIGATE DAMAGES

■ The Union contends that the Times failed to mitigate its damages because it did not discipline the employees engaged in the slowdown and refused to add overtime shifts until Friday evening when overtime wages were at double time rather than at time and a half rates. We understand but reject the argument. Upon the record, a trier of fact could reasonably conclude that the Times properly mitigated its damages by seeking injunctive relief.

U.S. 238, 245, 58 S.Ct. 154, 157, 82 L.Ed. 224 (1937); *United States v. Donn*, 661 F.2d 820, 824 (9th Cir. 1981).

## D. THE AWARD OF ATTORNEY'S FEES

■ It was error for the district court to include attorney's fees in an award of compensatory damages under § 301 of the Labor Management Relations Act, 29 U.S.C. § 185 (1976), for breach of the collective bargaining agreement. The Times argues that the attorney's fees were incurred in its effort to mitigate damages and that if they had not sought the injunction, the slowdown would have continued and the damages would have been greater. If we accepted this argument, the plaintiff in every action for compensatory damages should be awarded attorney's fees in order to be restored to his or her former position. This is contrary to the "American Rule" which awards attorney's fees only in exceptional circumstances, or where authorized by contract or statute. *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 247, 257, 95 S.Ct. 1612, 1616, 1621, 44 L.Ed.2d 141 (1975); *Mead v. Retail Clerks International Ass'n, Local Union No. 839, AFL–CIO*, 523 F.2d 1371, 1380–81 (9th Cir. 1975).

This action was brought pursuant to § 301, which authorizes breach of contract actions between unions and employers, but does not specifically provide for an award of attorney's fees. *See Cronin v. Sears, Roebuck & Co.*, 588 F.2d 616, 619 (8th Cir. 1978) ("Attorney's fees incurred in bringing a § 301 action do not arise to the status of compensatory damages."); *Int'l Brotherhood of Electrical Workers, Local No. 12, AFL–CIO v. A–1 Electric Service, Inc.*, 535 F.2d 1, 4 (10th Cir.), *cert. denied*, 429 U.S. 832, 97 S.Ct. 94, 50 L.Ed.2d 96 (1976) (attorney's fees should not be awarded under § 301). In contrast, § 303, 29 U.S.C. § 187 (1976), entitles a person injured as a result of an unfair labor practice to "recover the damages by him sustained and the cost of suit." In *Mead*, 523 F.2d at 1381, we held that an employer could not recover, in a § 303 suit for damages, the attorney's fees he incurred in an earlier unfair labor practice proceeding before the National Labor Relations Board. *Accord, Maxey v. Butchers' Union Local No. 126, Amalgamated Meat Cutters and Butchers Workmen*, 627 F.2d 912, 916 (9th Cir. 1980); *Summit Valley Industries, Inc. v. Local 112, United Brotherhood of Carpenters & Joiners*, 475 F.Supp. 665, 666–67 (D.Mont.1979), *aff'd mem.*, 652 F.2d 65 (9th Cir. 1981); *contra, Associated General Contractors v. Construction and General Laborers Local No. 563*, 612 F.2d 1060, 1063–64 (8th Cir. 1979).

Therefore, upon this record, it was error to include attorney's fees incurred in obtaining a TRO as an element of compensatory damages.

We affirm the award of damages in the correct sum of $26,168.16, not $26,068.96.[3] We reverse the award of attorney's fees.

AFFIRMED IN PART; REVERSED IN PART.

---

**3.** An error was made in adding the damages.

| Computation in the record: | Correct Computation: |
| --- | --- |
| 8/24/79 Damages: | |
| $3,170.96 | |
| 1,114.00 | |
| + 890.88 | |
| $5,075.84 | $5,175.84 |
| 9/17/79 Damages: | |
| $5,231.20 | |
| 2,984.00 | |
| + 890.88 | |
| 9,106.08 | 9,106.08 |

| Computation in the record: | Correct Computation: |
| --- | --- |
| 9/14/79 Damages: + 11,888.24 | + 11,886.24 |
| $26,068.96 | $26,168.16 |
| $7,836.40 | |
| 2,490.80 | |
| + 1,559.04 | |