**DISTRICT 30, UNITED MINE WORKERS OF AMERICA, and Local 1834, United Mine Workers of America, Petitioners, Cross-Respondents,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent, Cross-Petitioner,**

**TCH Coal Company and Joboner Coal, Intervenors.**

Nos. 86–5498, 86–5627.

United States Court of Appeals, Sixth Circuit.

Argued March 30, 1987.

Decided June 1, 1987.

James R. Hampton, argued, Hazard, Ky., for petitioners, cross-respondents.

Joseph Oertel, argued, Paul Spielberg, Elliott Moore, Deputy Associate General Counsel, N.L.R.B., Washington, D.C., Emil Farkas, Director, Region 9, N.L.R.B., Cincinnati, Ohio, for N.L.R.B.

Barbara L. Krause, Smith, Heenan and Althen, Washington, D.C., for intervenors TCH Coal Co. and Joboner Coal Co.

Before JONES and NORRIS, Circuit Judges, and COOK, District Judge.*

PER CURIAM.

District 30, United Mine Workers of America (District 30), and Local 1834, United Mine Workers of America (Local 1834) (referred to collectively as the unions), petition this court pursuant to section 10(f) of the National Labor Relations Act, 29 U.S.C. § 160(f) (1982), for review of an unfair labor practice order issued against them by the National Labor Relations Board (Board). *See* 278 N.L.R.B. No. 45. The Board has filed a cross-application pursuant to section 10(e) of the Act for enforcement of its order. TCH Coal Company (TCH) and Joboner Coal Company (Joboner) have been granted leave to intervene on the side of the Board. For the reasons given below, we grant the Board's application and enforce its order.

TCH operates a coal preparation plant in Millard, Kentucky. TCH also owns and leases various coal rights in Kentucky and contracts with various independent contractors to mine the coal and deliver it to TCH. Prior to April 1983, one of TCH's independent contractor suppliers was the Greasy Creek Coal Company, which operated a mine on the Greasy Creek in Pike County, Kentucky. The Greasy Creek Coal Company, along with TCH and the other feeder mines in the area, was a signatory to a collective bargaining contract with the United Mine Workers of America (UMW). In April 1983, the Greasy Creek Coal Company abandoned its site, the owner left

town, and its equipment reverted to the local bank. Its fourteen employees, all members of UMW Local 1834 and District 30, were out of work.

In late May or early June 1983, Samoyed Energy Company, Inc. (Samoyed), reactivated the Greasy Creek mine with its own equipment pursuant to an agreement with TCH. That agreement provided that Samoyed was an independent contractor and that Samoyed would control its own labor relations. It is uncontested that Samoyed was not the successor to the Greasy Creek Coal Company under the UMW contract. Samoyed hired five employees who were non-UMW members to begin clean-up operations. None of the fourteen laid-off union members were rehired.

In early June, District 30 Field Representative Eddie Ratliff appeared at the Samoyed mine site and asked Samoyed's principals, William Higginbotham and Clifford Marenko, whether they intended to sign the UMW contract. Higginbotham and Marenko were evasive and Ratliff left. He returned to the Samoyed mine site approximately ten days later and asked the same question of Samoyed's job superintendent John Hunter. Hunter told him he would have to ask Higginbotham and Marenko. In late June or early July, Ratliff asked TCH president Scott Kiscaden whether he would require Samoyed to sign the UMW contract. Kiscaden told him that Samoyed would handle its own labor relations.

On Saturday, July 9, laid-off Greasy Creek employee and former UMW mine committeeman Chester Burke appeared at the Samoyed mine site and told Hunter that there would be some "heads busted" if Samoyed did not put the "panel" back to work. The "panel" referred to the fourteen union members who appeared on the Greasy Creek seniority list. Burke reportedly threatened that a picket line would be established the following Monday, July 11, and "everything in this hollow will be stopped from work." As promised, approx-

* Honorable Julian A. Cook, United States District Judge for the Eastern District of Michigan, sitting by designation.

imately twenty protestors, including Burke, appeared at the Samoyed mine site on the morning of July 11. They blocked the road leading to the mine with "crib blocks" (large pieces of wood) and harassed Samoyed's nonunion employees.

That morning, Higginbotham and Marenko went to the District 30 offices to seek assistance in dealing with the protestors. They spoke with District 30 president Ernie Justice, vice-president Cornelious Owens, and Ratliff. The ALJ found that Ernie Justice told the Samoyed principals that:

they were running a scab operation and the work should be done with union employees; that they would continue to have problems until they signed the United Mine Workers contract; that when they signed the contract, their problem would go away; that they would have to take back the employees of Greasy Creek or they would not run any coal; and that if theydid not sign the contract, they definitely would not run any coal, and they would always have a problem.

App. 46. Higginbotham and Marenko then left the District 30 offices.

The following morning, July 12, Burke and the other former Greasy Creek employee-protestors expanded their picket line to additional locations besides the Samoyed mine site. Specifically, they set up a picket line at the "low water bridge," which had to be crossed by coal trucks making deliveries to the TCH preparation plant, and by TCH and Hopkins Creek Coal Company employees. They also set up a secondary picket on another road leading to the Joboner Coal Company. The employees of TCH, Hopkins Creek, and Joboner are all members of Local 1834, and none of them crossed these secondary picket lines to report to work.

Higginbotham and Marenko returned to the offices of District 30 on the morning of July 12. They again requested Ernie Justice to help them resolve the picket problem. The testimony of Higginbotham and Justice conflicted on this point, but the ALJ credited Higginbotham and found that Justice repeated the predictions and threats of the day before, telling them that Sa-

moyed's problems with the picketers would not go away until Samoyed signed the UMW contract and put the former Greasy Creek employees back to work. Higginbotham and Marenko left the office without signing the contract.

That same morning Curt Harris, president of Local 1834 and an employee of Hopkins Creek, was making a delivery and encountered the secondary picketers for the first time. He returned to work briefly, described the situation to Hopkins' superintendent Jess Justice, and requested permission to go to the District 30 offices to attempt to settle things. Harris reportedly called back to Jess Justice at 1:30 that afternoon and told him that the Samoyed principals had just signed the UMW contract, that Harris was calling a special meeting of Local 1834 for 5:00 that evening, and that everybody would be returning to work for the evening shift. The picketing did, in fact, stop that afternoon.

The Local 1834 meeting held on the evening of July 12 was attended by the member-employees of TCH, Joboner, and Hopkins Creek, as well as the former employees of Greasy Creek. Harris testified that he told the members that Samoyed had signed the UMW contract, and instructed the former Greasy Creek employees to stop picketing and the other union members to return to work. Harris further testified that some of the members at the meeting reacted negatively to this suggestion.

There was no picketing from the afternoon of Tuesday, July 12, through Sunday, July 17. However, that Saturday, July 16, Burke and another former Greasy Creek employee went to the Samoyed site and told mine superintendent Hunter that "if [Samoyed] didn't hire the panel back, there would be some heads busted." Also on July 16, and at the behest of Local 1834's financial secretary Keetis Prater, a meeting was scheduled for Monday morning at the Samoyed site between the unions' officials, the former Greasy Creek employees, Samoyed's principals, and TCH's general manager Scott Kiscaden.

A very large group (70–80 people) assembled at the Samoyed site on Monday morn-

ing, July 18. Apparently the Samoyed officials stated that the former Greasy Creek employees were not skilled in the use of special mining equipment. At that point, District 30's field representative Ratliff produced a contract book and argued that the union members had a right to update their skills and should be re-employed. Ratliff reputedly warned that trouble would continue until the Greasy Creek panel was rehired. At Kiscaden's suggestion, the parties agreed to submit the matter to arbitration.

The grievance was filed on behalf of the former Greasy Creek panel on Monday. Burke and the other former employees, however, decided that the system would not work for them and they reinstituted their pickets at the Samoyed site as well as the secondary locations on Tuesday, July 19. By all accounts, the picketing that Tuesday was violent, and the Kentucky State Police were called to escort the Samoyed employees through the lines that evening. The primary and secondary pickets continued at least through Tuesday, July 26. During that time, no Local 1834 members (including the Local's officers) reported for work at TCH or Joboner, and delivery trucks traveling to TCH were turned back at the low water bridge.

Owen, Ratliff and Harris allegedly went to the Samoyed mine site on the morning of the 19th to urge the picketers to disperse and to rely on the grievance procedure. A second special meeting of the Local 1834 membership was held on July 20, at which time Ernie Justice reputedly urged the cessation of the picketing and a return to work by all Local 1834 members. Both of these efforts were unsuccessful.

At some time prior to July 30, a state civil action for damages was instituted by one of the employers, and the trial court issued a temporary restraining order against the picketing. A third special meeting was called by Local 1834 for July 30, and when the union members were told of the pending civil action, they stopped their picketing.

After a full evidentiary hearing, the ALJ issued his decision finding that the unions violated section 8(b)(1)(A) and (b)(2), 29 U.S.C. § 158(b)(1)(A), (b)(2), by executing a collective bargaining agreement with Samoyed, said agreement containing a union-security clause, at a time when the unions did not represent a majority of Samoyed's employees. He also found that the unions further violated section 8(b)(1)(A) by coercing and restraining Samoyed's employees from July 11 through July 29, 1983, by blocking ingress and egress to the Samoyed mine site, physically threatening the employees, and maliciously damaging property of the employees and the company. The ALJ finally found that the unions committed unfair labor practices by ratifying, condoning or endorsing the illegal secondary picketing during this same time period in violation of section 8(b)(4)(i)(B) and (ii)(B), 29 U.S.C. §§ 158(b)(4)(i)(B), (ii)(B).

The Board reviewed this decision and adopted all the findings but one. The Board reversed the finding that the unions violated section 8(b)(1)(A) by threatening the Samoyed employees. This finding was based on the comments of Burke and attributed to the unions by virtue of Burke's status as a "mine committeeman." However, the unions had argued that under the contract, Burke was a committeeman and therefore an agent of the unions only so long as he was employed in the mines. Since he was unemployed at the time he made the threats, the unions argued that they were not responsible for his conduct. The ALJ had not thought it necessary to decide the issue of Burke's agency. The Board, however, ruled that absent a finding of a direct agency relationship between Burke and the unions at the time of the threats, the evidence in the record was insufficient to support a finding of an 8(b)(1)(A) violation on this ground. In all other respects, the Board adopted and affirmed the ALJ's findings and decision.

The Board is currently before the court seeking enforcement of its order. The unions challenge the Board's findings that it is liable under section 8(b)(1)(A) for blocking ingress and egress at the Samoyed mine site and under sections 8(b)(4)(i)(B) and (ii)(B) for the secondary picketing. The

Board's factual findings are conclusive in this court so long as they are supported by substantial evidence on the record as a whole. 29 U.S.C. § 160(e) (1982); *NLRB v. Fry Foods, Inc.*, 609 F.2d 267, 271 (6th Cir.1979) (per curiam).

## I.

The ALJ's findings of violations on the contractual issues under section 8(b)(1)(A) and (b)(2) were not challenged before the Board and are not challenged in this court. It is uncontested that the unions performed the acts alleged, i.e., entering into a collective bargaining agreement containing a union-security clause at a time when they did not represent a majority of Samoyed's employees (in fact they did not represent *any* of Samoyed's employees). It is also clear that these actions constitute violations of the above statutes. *See Garment Workers v. NLRB*, 366 U.S. 731, 737, 81 S.Ct. 1603, 1607, 6 L.Ed.2d 762 (1961); *Local Lodge 1424 v. NLRB*, 362 U.S. 411, 413–14, 80 S.Ct. 822, 824–25, 4 L.Ed.2d 832 (1960). Because the unions have waived any objections they might have had to these findings, the Board is entitled to summary affirmance on the contractual issues. *Woelke & Romero Framing, Inc. v. NLRB*, 456 U.S. 645, 665–66, 102 S.Ct. 2071, 2083, 72 L.Ed.2d 398 (1982).

## II.

█ In general, section 8(b)(1)(A) prohibits labor organizations or their agents from coercing or restraining employees in the exercise of their rights under section 7, 29 U.S.C. § 157 (1982). One of the section 7 rights is the right of employees to work without representation where no valid collective bargaining provision requires their affiliation with a union. The act of the picketers of blocking ingress and egress at the Samoyed site clearly was an attempt to restrain Samoyed's employees' rights under this section.

Section 8(b)(4) prohibits labor organizations or their agents from engaging in or inducing or encouraging others to engage in a secondary strike or secondary picketing. The purpose of this section is "to confine labor conflicts to the employer in whose labor relations the conflict ha[s] arisen, and to wall off the pressures generated by that conflict from unallied employers." *Carpet Layers, Local 419 v. NLRB*, 467 F.2d 392, 397 (D.C.Cir.1972) (citations omitted).

The unions do not contest that the picketers committed the acts described. They also do not contest that if they are responsible for the picketers' actions, then they have violated the above statutory provisions. They only contest the Board's finding that they carry some responsibility for the picketers' actions.

This court recently addressed a similar issue in *Kitchen Fresh, Inc. v. NLRB*, 716 F.2d 351 (6th Cir.1983):

> Generally, a union is not responsible for the acts of an employee, unless the employee is an agent of the union. *See, e.g., NLRB v. Georgetown Dress Corp.*, 537 F.2d 1239, 1244 (4th Cir.1976). To determine whether an employee ... is an agent of a union, the question must be analyzed within the framework of common law agency principles. *NLRB v. Local # 64, Falls City Council*, 497 F.2d 1335, 1336 (6th Cir.1974). Common law principles of agency, however, are not to be rigidly applied. 29 U.S.C. Sec. 152(13); *Worley Mills, Inc. v. NLRB*, 685 F.2d 362, 366 n. 2 (10th Cir.1982). *The question whether an employee is an agent is a question of fact, id.* at 366; *the party seeking to prove that an employee is a union agent must show that the union "instigated, authorized, solicited, ratified, condoned or adopted" the employee's actions or statements. NLRB v. Miramar of California*, 601 F.2d 422, 425 (9th Cir.1979).

*Kitchen Fresh*, 716 F.2d at 355 (emphasis added). The unions argue that they called special meetings of the membership, repeatedly ordered the strike stopped and told the other members to return to their jobs. They point out that the picketers were former Greasy Creek employees and argue that they were not officers or agents of the unions. Finally, they characterize the Board's findings of violations as, in

reality, findings that the unions did not use their "best efforts" to stop the illegal picketing. The "best efforts" test has been rejected by the Supreme Court and this circuit. *See Carbon Fuel Co. v. United Mine Workers,* 444 U.S. 212, 216–18, 100 S.Ct. 410, 413–14, 62 L.Ed.2d 394 (1979); *United Steelworkers v. Lorain,* 616 F.2d 919, 921 (6th Cir.1980).

■ The unions mischaracterize the test used by the Board. In those portions of the ALJ's decision adopted by the Board, the basis for the findings of violations was clearly set out. The ALJ stated that "the record evidence which I credit clearly reveals that *District 30* president Justice *ratified and condoned* the protest actions of the former Greasy Creek employees.... Justice clearly placed District 30 in a position which rendered it liable for the protest actions of the former Greasy Creek employees." App. 54 (emphasis added). This finding is supported by substantial evidence in the record as a whole. The record is replete with Ernie Justice's veiled threats that the entire hollow would be shut down and that nobody would run any coal unless Samoyed signed the contract and put the Greasy Creek panel back to work. These statements, by the District 30 president, easily could be interpreted as condoning and ratifying the picketers' actions and thus render District 30 liable for those actions.

The basis for the finding that Local 1834 was also liable is not quite so obvious. The ALJ conceded that the record did not reveal that Local 1834 expressly ratified and condoned the protest actions. Instead, the ALJ relied on the fact that during the latter nine-day period from July 19 through July 27, none of the members of Local 1834 who worked for TCH, Joboner and Hopkins Creek, including the Local's officers, crossed the illegal picket lines and reported for work. Although the Local called two special meetings and ordered the picketing stopped and the members back to work, those orders were ignored by all concerned—even the officers who made them. The ALJ concluded that:

the actions taken by Local 1834 were predictibly inadequate to cause its strik-

ing members to return to work while protesting continued. This, coupled with the fact that the Local participated in the strike as an entity, causes me to find that Local 1834, as well as District 30, is liable for the actions of the protesting former Greasy Creek employees, who are also members of Local 1834.

App. 54.

■ The Board adopted these findings, and on review, we find them supported by substantial evidence in the record as a whole. It is one thing to say that a union need not take "affirmative action to end a strike," or put forth its "best efforts" to stop illegal action by its members, in order to avoid civil liability under section 6 of the Norris-La Guardia Act, 29 U.S.C. § 106 (1982). It is quite another to suggest that in enforcing section 8(b) of the National Labor Relations Act, the Board is not entitled to rely on common law agency principles and draw inferences from the actions of union officials that the union ratifies or condones illegal picketing by union members. Local 1834 argues that when its officials and members honored the picket lines of the former Greasy Creek employees, they were engaging in protected concerted activity, *see Redwing Carriers, Inc.,* 137 N.L.R.B. 1545, 1546–47 (1962), and that such protected activity cannot form the basis of an inference that the Local committed an unfair labor practice. We disagree with the premise of this argument.

*Redwing Carriers,* and subsequent similar cases, concern alleged section 8(a) violations by employers who discharge employees for their refusal to cross legal picket lines at other businesses. In the instant case, the picket lines that were honored were clearly illegal, and union support for them would have been condemned activity under section 8(b) rather than protected activity. The only question here is one of agency, and we rule that the Board did not err in looking to the "predictably inadequate" actions of union officials to determine the culpability of the unions for condoning or ratifying illegal picketing. *See U.S. Steel Corp. v. United Mine Workers,* 598 F.2d 363, 365–66 (5th Cir.1979) (union

official's back to work instructions were so foreseeably ineffective that the union's approval and encouragement for the activity might be inferred).

Accordingly, we DENY the unions' petition for relief from the Board's determination and order, and GRANT the Board's application for enforcement.