ISLAND CREEK COAL CO., Plaintiff,

v.

**LOCAL NO. 2232, UNITED MINE WORKERS OF AMERICA,** Defendant.

Civ. A. No. 89–0053–B.

United States District Court,
W.D. Virginia,
Big Stone Gap Division.

March 14, 1990.

Joe Ashworth, Atlanta, Ga., Lynn Lloyd Laughlin, Greenville, S.C., and Stephen M. Hodges, Abingdon, Va., for plaintiff.

James Vergara, Hopewell, Va. and Stephen Vickers, Castlewood, Va., for defendant.

## MEMORANDUM OPINION

GLEN M. WILLIAMS, Senior District Judge.

The question presented by this case is whether a local union may be held liable for damages from a strike by its membership which was not instigated or led by officers of the local, under the "mass action" or agency theories of recovery, as a violation of an implied no-strike obligation in the labor agreement entered into between the parties.

### I.

On March 22, 1989, the 12:00 A.M. shift of Island Creek Coal Company's VP5 mine near Oakwood, Virginia, struck the company over a series of unresolved grievances. When the 8:00 A.M. shift failed to report for work, Island Creek obtained a temporary restraining order from this court, which was entered at 2:05 P.M. However, two more shifts failed to report before

work was resumed at 8:00 A.M. on March 23.

As part of its petition for a temporary restraining order, Island Creek sought damages for its lost production under § 301 of the Taft–Hartley Act, 29 U.S.C. § 185, against Local 2232, which represents all of the workers at VP5. The company maintains that the walkout was in violation of the National Bituminous Coal Wage Agreement (NBCA) of 1988, a collective bargaining agreement entered into between it and the International Union, United Mine Workers of America.

The company alleges that the collective bargaining agreement contains a binding arbitration agreement which is the exclusive procedure for resolving grievances between the company and its union employees, and that it is incumbent on both sides to "maintain the integrity of [the] contract." National Bituminous Coal Wage Agreement of 1988, Article XXVII. The officers of the local, however, made only token attempts to end the walkout, and since their efforts were "foreseeably ineffective," they ratified the actions of the strikers and are thus liable for damages for the lost production which resulted.

The local, for its part, says that it is clear that its officers tried to prevent the walkout by ordering the men back to work and broadcasting announcements to the same effect. Without participation by the local union officials, there can be no liability under either the mass action or agency theories of union liability.

Since so much depends on the exact definition of "mass action," the court believes a review of its development and origin will be helpful.

## II.

On March 15, 1947, there was a nationwide walkout of between three hundred fifty and four hundred fifty thousand bituminous coal miners across the United States, 87 percent of whom were members of the United Mine Workers of America. On April 3, President Truman, acting through his Attorney General, petitioned the United States District Court for the District of Columbia for an injunction against the UMW prohibiting "what he deemed to be a strike," and that evening, the court entered a temporary restraining order ordering the strike to cease. *See United States v. International Union, UMWA*, 77 F.Supp. 563, 564–5 (D.C.Cir. 1948).

In its defense, the union claimed that it had called no strike, and that the miners had walked out on their own. *Id.* The court, however, interpreted the language in a letter sent by the President of the UMW, John L. Lewis, to the NBCA signatories as "constitut[ing] a nod, a wink, or the use of a code in order to call a strike." *Id.* at 566. To combat this "new method of endeavoring to avoid responsibility," the court held "that as long as a union is functioning as a union, it must be held responsible for the mass action of its members. It is perfectly obvious … that men don't act collectively without leadership." *Id.*

Although originally devised in order to impose liability on an international union, the Fourth Circuit restricted the mass action theory in *Carbon Fuel Co. v. UMWA*, 582 F.2d 1346, 1351 (4th Cir.1978), to local unions only. On appeal, the United States Supreme Court affirmed, holding that the legislative history—specifically a statement by Senator Taft explaining § 301(e) [1]—established that Congress wanted to impose liability only on the basis of common law agency. *Carbon Fuel Co. v. UMWA*, 444 U.S. 212, 217, 100 S.Ct. 410, 414, 62 L.Ed.2d 394 (1979). *See also Coronado Coal Co. v. UMWA*, 268 U.S. 295, 304–5, 45 S.Ct. 551, 554, 69 L.Ed. 963 (1925) ("It is a mere question of actual agency…."). The Fourth Circuit's imposition of liability on the *local* union for the mass action of its members, however, was not

---

**1.** § 301(e), 29 U.S.C. § 185(e), states:

For the purposes of this section, in determining whether a person is acting as an 'agent' of another person so as to make such other person responsible for his acts, the question of whether the specific acts performed were actually authorized or subsequently ratified shall not be controlling.

appealed, and not discussed by the Supreme Court.

Since this holding, a lively fountain of litigation has erupted on the issue of whether the Supreme Court's rejection of mass action liability for international and district unions should be extended to locals as well. Courts in several circuits have so held. *Consolidation Coal Co. v. Local 2216, UMW,* 779 F.2d 1274, 1279 (7th Cir. 1985); *Consolidation Coal Co. v. UMWA Local 1261,* 725 F.2d 1258, 1263 (10th Cir. 1984); *California Trucking Assn. v. Int'l Bro of Teamsters,* 679 F.2d 1275, 1287 (9th Cir.1982); *Davis Co. v. United Furniture Workers of America,* 674 F.2d 557, 564–5 (6th Cir.1982). The Seventh Circuit remarked:

> We find something basically repugnant in the assumption ... behind the mass action theory's logic that a local union should be considered guilty of orchestrating a strike until it proves itself innocent.... With the mass action theory of liability all the plaintiff/company need do for its case in chief is stand up in front of a judge or jury and say, 'The strike occurred.' Then plaintiff may sit down and watch defendant union try to exonerate itself.... We deem the common law agency theory of liability more desirable because the employer who does the initial accusing would need to establish [that] the local union officials instigated, supported, ratified, or encouraged the strike in some way. Only then would it be up to the union to refute the accusations.

779 F.2d at 1277.

In the view of the Fourth Circuit, however, the mass action theory remains "a sensible and pragmatic approach to this difficult problem in the area of labor relations." *Consolidation Coal Co. v. Local 1702, UMW,* 709 F.2d 882, 885 (4th Cir. 1983) (*Consolidation II*) (quoting *Carbon Fuel,* 582 F.2d at 1349–50). The court viewed the Supreme Court's holding in *Carbon Fuel* as merely being that "in view of the collective bargaining history between the parties in that case, neither the international nor the district union was under an obligation to use 'all reasonable means' to prevent or terminate wildcat strikes engaged in by local unions. There is nothing in the logic of that holding that prevents the application of the mass action theory on the local level."

The reason that wildcat strikes present such a difficult problem for the courts is the same as articulated in the original mass action case in 1948. A strike may occur, in violation of contract terms or of a court order or both, but after the stoppage is over the leadership will deny all responsibility, declaring that they did not call the strike and that they did their best to get the men back to work. Since there is no way for an outside observer to know if the leadership's exhortations were made with "a nod, a wink, or the use of a code," all that is necessary to establish liability due to mass action is that all the members of the local, including the officers, walked out. *Consolidation II,* 709 F.2d at 885 (quoting *Carbon Fuel,* 582 F.2d at 1350).

## III.

■ Before examining the facts in the case at hand, the court notes that the defendant has raised the threshold issue of whether any liability may be imposed under § 301 where the contract between management and labor does not contain a no-strike clause.

The Supreme Court in *Carbon Fuel* addressed the question of whether the contract between the petitioner, a coal operator, and the respondents, the international union, UMWA, and District 17, implied an obligation on the respondents to use "all reasonable efforts" to end wildcat strikes. 444 U.S. at 218, 100 S.Ct. at 414. In the course of answering this question, the Court examined the bargaining history between the parties, noting that "the first agreement ..., in 1941, contained an explicit no-strike clause," but that this was deleted from the 1947 contract. *Id.* at 219, 100 S.Ct. at 415.

The 1950 contract inserted the language that both sides would "maintain the integrity of this contract and ... exercise their best efforts through available disciplinary

670

measures to prevent stoppages of work by strike or lockout." This, too, was unsatisfactory to the union, and in the 1952 contract all references to "best efforts" were excised. *Id.* at 220, 100 S.Ct. at 415. All that was left was the integrity clause. *Id.* at 221, 100 S.Ct. at 416. This language has been carried into the current contract.

Based upon these alterations in the original no-strike clause, the Supreme Court concluded that the parties had not intended to impose a duty on the international union to use its best efforts, whether disciplinary or otherwise, to end wildcat strikes.

The defendant states that it is clear that the Supreme Court in *Carbon Fuel* found that courts could not infer the existence of a duty not to strike in light of the above bargaining history. A close reading of *Carbon Fuel*, however, demonstrates that the Court was merely concerned with whether the "integrity clause" meant that the union, at the international and the district levels, was required to use its best efforts to stop wildcat strikes.

As a matter of fact, the Supreme Court opinion which is squarely on point is cited, though not discussed, by the defendant. The question presented in *Teamsters v. Lucas Flour Co.*, 369 U.S. 95, 82 S.Ct. 571, 7 L.Ed.2d 593 (1962), was put and answered by Mr. Justice Stewart as follows:

> Whether, as a matter of federal law, the strike which the union called was a violation of the collective bargaining contract is thus the ultimate issue.... It is argued that there could be no violation in the absence of a no-strike clause in the contract explicitly covering the subject of the dispute over which the strike was called. We disagree.

The collective bargaining contract expressly imposed upon both parties the duty of submitting the dispute in question to final and binding arbitration.... [A]t least five Federal Circuits have held that a strike to settle a dispute which a collective bargaining agreement provides shall be settled exclusively and finally by compulsory arbitration constitutes a violation of the agreement.... We approve that doctrine. To hold otherwise would obviously do violence to accepted principles of traditional contract law. Even more in point, a contrary view would be completely at odds with the basic policy of national labor legislation to promote the arbitral process as a substitute for economic warfare.

*Id.* at 105, 82 S.Ct. at 577–78 (citations omitted).

Whether there is a no-strike clause in force, therefore, is unimportant in the present case if, as the complaint alleges, the strike occurred over arbitrable issues. It is not the strike itself, but the violation by the defendant of the contract terms requiring health and safety issues to be submitted to arbitration as *manifested* by the wildcat strike which creates liability under § 301 of the Taft–Hartley Act. Here, the defendant concedes in 7 of its answer to the complaint that the collective bargaining agreement between the parties requires "disputes arising under this Agreement" to be submitted to binding arbitration. Furthermore, deposition testimony from the defendant's President Terry Puckett, at page 41, and Vice–President, Chris Lester, at page 38, was clear that the issues involved were ones that should have been submitted to arbitration.[2] Therefore,

**2.** *See also* Danny Sparks deposition at 28. Sparks is a safety committeeman with Local 2232. The list of grievances compiled by Mr. Lester is as follows:

Foreman threatening employee with use of weapon.
Working men behind belts after injuries occurred.
Dirty and over-crowded rides.
Company not making sincere effort to settle safety issues.
Mistreatment of employees who raise safety issues.

Running coal on Saturday and not giving everyone opportunity to work.
Changing starting times for any employee at any time.
Leaving sections without rides for long periods of time.
No respect for a man's classification or seniority.
Allowing belts to run in dangerous condition.
Still cutting places wide on 5D after being questioned several times.
Not allowing employees a reasonable time to eat.

if the facts show that a strike occurred over these grievable issues, liability under § 301 will be established.

### IV.

■ The plaintiff has moved for summary judgment. Fed.R.Civ.Proc. 56(c) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law." The rule requires more than "the mere existence of *some* alleged factual dispute between the parties;" the issue must be *"genuine"* and the fact must be *"material." Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–8, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986) (emphasis in original).

The evidence in this case consists of the pleadings, affidavits of VP5's mine superintendent, Calvin Ward, and depositions of five officers and committeemen of Local 2232. The facts are undisputed that, as noted above, the midnight or hoot-owl shift at Island Creek's VP5 mine struck the company; that the strike was over arbitrable issues; and that it continued for four shifts, until the 8:00 a.m. shift on March 23, despite the fact that this court issued a temporary restraining order at 2:05 p.m. on March 2. Defendant's President, Mr. Puckett, and financial secretary, Elza Mullins, were not working at the time due to disability, but Mr. Lester, the Vice–President and Acting President in Mr. Puckett's absence, had reported for work at the mine at about 11:40. Lester Dep. at 7. His deposition testimony is clear that neither

he nor any other union officers worked that evening. *Id.* at 18–19. No one worked the 8:00 a.m. shift, although a union meeting was called for 11:00 a.m., at which Mr. Lester ordered the men back to work again. Danny Sparks Dep. at 33. Despite this, the evening, or 4:00 p.m., shift failed to work, and Mr. Lester's orders to the midnight shift on March 23 were again ignored. *Id.* at 40.

In other words, the testimony from the mouths of defendant's own officers is conclusive and undisputed that the entire membership of Local 2232 engaged in a strike over arbitrable issues in violation of the collective bargaining agreement, and that the leadership of the local participated in the strike. This is all that is required for a finding of liability under the mass action theory. Therefore, summary judgment will be granted to the plaintiff.

### V.

■ The other theory upon which the defendant might be found liable for damages flowing from the strike is agency. Whatever the current or future status of the mass action theory may be, there is no question that Congress intended common-law agency principles to be valid means for imposing liability under § 301. *Carbon Fuel Co. v. UMW,* 444 U.S. at 217, 100 S.Ct. at 414. Liability may be imposed if there is sufficient evidence to demonstrate that the local authorized, instigated, supported, ratified, or encouraged an illegal work stoppage. *Consolidation II,* 709 F.2d at 885.

Where, as here, there is no evidence that local union officials actually called the

---

Not making reasonable settlement on safety or try to talk the men out of the issue.
Broken rails on longwall not being repaired.
Trying to work men in return while running coal.
One man doing three men's jobs outside.
Dirty bathhouse on idle day work.
Bad gas problems being ignored.
Working men with improper tools everywhere in the mines.
Will not let safety man check gas after being gassed off before laborers going inside after we've had this problem before.

Rockdusting belts between shifts and then starting belts before next shift gets on section and in smoke-free floors in bathhouse need painting and are being ignored by company. Employees are being ignored on their sickness and accident claims and compensation benefits being settled.
Need more belt ventilation jobs posted on third shift.
Men being worked in excessive amounts of water around bad cables.

strike, the local may still be held liable if it encourages, supports, or otherwise ratifies the stoppage. Ratification may be inferred if the local leadership fails to take serious measures to get its members back on the job. *Id.* at 886.

■ In order to gauge the sincerity of the leadership's back-to-work efforts, the Fourth Circuit has come to insist that the leadership do more than issue halfhearted "orders" to return to work, or, as is sometimes said, the mere "parroting of stage lines" for the benefit of the court at a later date. *See United States Steel Corp. v. UMWA,* 598 F.2d 363, 366 (5th Cir.1979). "Foreseeably ineffective" measures will not suffice. *Consolidation Coal Co. v. Local 1702, UMWA,* 683 F.2d 827, 831 (4th Cir.1982), (*Consolidation I*) *quoting United States Steel Corp.,* 598 F.2d at 366.

In *Consolidation II,* the Fourth Circuit found ratification where local union leadership took only two steps to end the walkout: (1) officers and committeemen "encouraged" strikers to return to work at the beginning of their regularly scheduled shifts; and (2) the officers of the local held a meeting two days after the start of the strike and "instructed" the members to return. *Consolidation II,* 709 F.2d at 886.

The measures that the leadership did not take, however, were more significant: (1) the leadership did not return to work until being held in contempt of court; (2) no broadcasts were made on radio or television, no advertisements were placed in newspapers, no telegrams or letters were sent and no telephone calls were made, to order the miners back to work; and (3) no members were threatened with disciplinary measures for failing to work, although the international union's constitution and the local's bylaws provided such measures. *Id. Cf. Consolidation I,* 683 F.2d at 831 (only action taken was "requests at the gate of the mine"). *See also United States Steel,* 598 F.2d at 366 (instructions to members at bathhouse to return to work and two union meetings "foreseeably ineffective").

In this case, the deposition evidence from Local 2232's officers and committeemen was that the strike began because of griev-

ances over safety and work issues, and a foreman threatening an employee with a weapon. Lester Dep. at 29, 31–35, 36. Chris Lester, as Acting President of the local, made a list of the grievances and attempted to get the members to go ahead with the March 22 midnight shift, but the men reiterated their complaints, Sparks Dep. at 31, and accused the officers of podex osculation. Tom Stacy Dep. at 21. The men finally walked out. Lester Dep. at 43. After that, nothing more was done that night about getting the men back to work apart from the Recording Secretary, Donnie Farmer, posting a notice on the bulletin board for a special meeting the following morning at 11:00 or 11:30. *Id.* at 47; Donnie Farmer Dep. at 14–15.

In the morning, Mr. Farmer called a radio station or two to run an announcement about the meeting. Mr. Lester and Mr. Farmer remember that Mr. Puckett, Local 2232's President, led the meeting, Farmer Dep. at 17; Lester Dep. at 48, although Mr. Puckett's memory is hazy on whether he even attended the meeting. Puckett Dep. at 36.

In any event, at the meeting *someone* ordered the men back to work, although apparently no records were kept of who actually attended. Farmer Dep. at 17–18. No vote was taken, and no motion was made to return to work. Lester Dep. at 65. After this time was bought on local radio stations for announcements repeating the back-to-work order. *Id.* These were ignored at the 4:00 p.m. shift, Calvin Ward Affidavit, and the midnight shift on March 23, despite further "orders" from Mr. Lester. Farmer Dep. at 21, Lester Dep. at 59, 62. At this time, Mr. Lester also referred to the temporary restraining order entered by this court the previous afternoon; apparently because of another wildcat strike later in the year, no one can remember just when the TRO was served, when it was posted, or when the membership was notified. The walkout ended when the 8:00 a.m. shift returned to work.

In this case, in contrast to *Consolidation II,* radio announcements were used to some extent to tell the strikers to return to work,

but that was the only addition to the steps taken by the defendant in *Consolidation II*, steps which the Fourth Circuit described as "meager" and "foreseeably ineffective." 709 F.2d at 886. No officer or committeeman led by example by returning to work. None of the members were telephoned, and no internal discipline was used or threatened; indeed, Mr. Puckett and Mr. Lester claimed to be ignorant of the availability of disciplinary measures. Puckett Dep. at 15–16; Lester Dep. at 20–21. As the Fourth Circuit noted, the UMW's constitution "imposes duties on local officials to enforce contracts, to take all measures necessary to end any unauthorized work stoppage, and not to participate in any strike not authorized by the international union." *Consolidation II*, 709 F.2d at 886.

Therefore, under the law as it has developed in this Circuit, this court finds that the feeble efforts by Local 2232 to end the wildcat strike were foreseeably ineffective, that the local made itself a party to the strike, and that it is liable under common law agency for the damages as flowing from the strike. The court will hold a hearing to determine the amount of the damages, if any.

An appropriate Order will enter this day.