**GATEWAY COAL COMPANY, Plaintiff,**

v.

**INTERNATIONAL UNION, UNITED MINE WORKERS OF AMERICA; District 4, United Mine Workers of America; and Local 6330, United Mine Workers of America, Defendants.**

Civ. A. No. 89–2430.

United States District Court,
W.D. Pennsylvania.

April 15, 1994.

Sally Cimini, Polito & Smock, P.C., Pittsburgh, PA, for plaintiff.

Claudia Davidson, Davidson, Healey & Whitehill, Pittsburgh, PA, Christy Hoffman, Washington, DC, for defendants.

## *OPINION*

### D. BROOKS SMITH, District Judge.

#### I. *Introduction*

Plaintiff Gateway Coal Company ("Gateway") brought this action pursuant to Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185, for damages allegedly sustained as a result of the defendants' (collectively, "the Unions") participation in, or authorization of, work stoppages in violation of a collective bargaining agreement at Gateway coal mines during the 1989 United Mine Workers of America ("UMWA") strike against the Pittston Coal Company. This matter is currently before the Court on defendants' Motion for Summary Judgment (Docket No. 28) and Motion to Strike Damage Claim (Docket No. 39).

The Unions' motions contest both liability and damages. As to liability, the Unions contend that Gateway has not produced any evidence that the UMWA International Union, District 4 or Local 6330 authorized, sanctioned, or even participated in the picketing and work stoppages which occurred at Gateway mining facilities in the summer of 1989. With respect to damages, the Unions argue that Gateway has not adduced sufficient evidence to prove damages with reasonable certainty.

Gateway responds that the evidence and the reasonable inferences drawn therefrom support its allegation that the work stoppages and pickets at Gateway mining facilities were part of a broader pattern of strikes instigated and ratified by the Unions. With respect to damages, plaintiff argues that defendants ignore Gateway's claims for fixed costs that would not have been incurred but for the work stoppage, and for variable costs that were allegedly higher when actually incurred than they would have been if incurred during June and July of 1989, the period during which work was stopped due to strikes.

### II. *Discussion*

#### A. *Summary Judgment*

Federal Rule of Civil Procedure 56(c) requires the entry of summary judgment "... if the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." "[T]he requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (emphasis in original). An issue of fact is "genuine" if the evidence is such that a reasonable jury might return a verdict for the non-moving party. *Anderson*, 477 U.S. at 257, 106 S.Ct. at 2514–15; *Equimark Commercial Finance Co. v. C.I.T. Financial Services Corp.*, 812 F.2d 141, 144 (3d Cir.1987). The presence or absence of any plausible motive to engage in conduct is relevant to whether a genuine issue of fact exists within the meaning of Rule 56(e). *Matsushita Elec. Ind. Co. v. Zenith Radio*, 475 U.S. 574, 597, 106 S.Ct. 1348, 1361, 89 L.Ed.2d 538 (1986).

Once the moving party has satisfied its burden of identifying evidence which demonstrates the absence of a genuine issue of material fact, the non-moving party is required to go beyond the pleadings by way of affidavits, depositions, and answers to interrogatories in order to demonstrate specific material facts which give rise to a genuine issue. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265

(1986). When Rule 56(e) shifts the burden of proof to the non-moving party, that party must produce evidence to show the existence of every element essential to its case which it bears the burden of proving at trial. *Equimark, supra* at 144.

### B. *Liability/Agency*

It is well settled that "Congress limited the responsibility of unions for strikes in breach of contract to cases when the union may be found responsible according to the common-law rule of agency." *Carbon Fuel Co. v. United Mine Workers of America,* 444 U.S. 212, 216, 100 S.Ct. 410, 413, 62 L.Ed.2d 394 (1979). *Carbon Fuel* effectively overruled the law of this circuit established by *Eazor Express, Inc. v. Int'l Bro. of Teamsters,* 520 F.2d 951 (3d Cir.1975), *cert. denied* 424 U.S. 935, 96 S.Ct. 1149, 47 L.Ed.2d 342 (1976), *reh'g denied* 425 U.S. 908, 96 S.Ct. 1502, 47 L.Ed.2d 758 (1976), that a collective bargaining no strike provision implied an obligation on the union's part to use every reasonable means to stop an unauthorized strike. Defendants argue that, subsequent to *Carbon Fuel,* the only way Gateway can establish their liability under common law agency principles is to adduce direct evidence that the International, District or Local Unions were "behind" the strikes and pickets at Gateway mining sites during June and July 1989. Defendants contend that because Gateway has not identified any picketers as UMWA members, has not procured admissions from Union representatives to the effect that the Unions ratified the strikers' actions, and has not been able to discover a recorded manifestation of authorization by the Unions, the company cannot establish liability. Defendants' Brief in Support of Motion for Summary Judgment 5–9.

■ However, *Carbon Fuel* does not preclude plaintiff from attempting to prove common law agency by means of circumstantial evidence. In *Carbon Fuel,* the Court simply held that the international union could not be held liable for damages resulting from "strikes not authorized, participated in, or ratified by" it, on the ground that it did not use "all reasonable means" available to it to prevent or quash the strike. *Carbon Fuel,* 444 U.S. at 216–218, 100 S.Ct. at 413–414. The Court determined that the "all reasonable means" or "best efforts" theory of liability was not codified in Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185, because it added an implied duty on the part of unions, in addition to the principle of agency required by Section 301(e),[1] stating: "In the face of Congress' [codification of the agency relationship requirement], it would be anomalous to hold that an international is nonetheless liable for its failure to take certain steps in response to actions of the local." *Id.* at 217–18, 100 S.Ct. at 414. Casting aside the "all reasonable means" theory of liability, the *Carbon Fuel* Court reiterated the necessity of establishing agency as a predicate for union liability under Section 301.

The parties disagree on what theories of union liability remain in the wake of *Carbon Fuel.* Gateway suggests that it may establish the Unions' liability for the work stoppage either by: (1) direct evidence that the Unions "instigated, supported, ratified, or encouraged the activity complained of," Plaintiff's Brief in Opposition to Motion for Summary Judgment at 54 (quoting *Feather v. United Mine Workers of America,* 903 F.2d 961 (3d Cir.1990); or (2) invoking the "mass action theory," pursuant to which unions may be held liable when all or most union members simultaneously engage in an illegal work stoppage. Defendants agree that direct evidence of authorization would be sufficient to establish liability, but vigorously dispute that the mass action theory retains any viability subsequent to *Carbon Fuel.* Defendants' Reply to Plaintiff's Response to Motion for Summary Judgment 2–6.

■ Both parties' arguments with respect to the mass action theory of liability appear to presuppose that mass action is a theory separate and distinct from the common law

---

1. Section 301(e), 29 U.S.C. § 185(e), provides:
   For the purposes of this section, in determining whether any person is acting as an "agent" of another person so as to make such other person responsible for his acts, the question of whether the specific acts were actually authorized or subsequently ratified shall not be controlling.

rule of agency, in which liability must be imputed to unions irrespective of agency principles whenever a large percentage of union members take part in an unauthorized strike. That theory was invalidated by *Carbon Fuel*. *See Consolidation Coal Co. v. UMWA, Local 1261*, 725 F.2d 1258, 1261 (10th Cir.1984); *Old Ben Coal Co. v. Local Union No. 1487*, 601 F.Supp. 1061, 1063 (S.D.Ill.1984); *Airco Speer Carbon Graphite v. Local 502, Int'l Union of Elec., Radio and Machine Workers*, 494 F.Supp. 872 (W.D.Pa. 1980). However, as some courts and at least one commentator have noted, the idea of "mass action" need not, and should not, be considered a separate theory of liability, as was the now defunct "all reasonable efforts" theory. Rather, the mass action theory is best understood as a shorthand description of the inference of agency from the otherwise inexplicable (and improbable) phenomenon of hundreds or thousands of people in different locations simultaneously acting in concert toward a certain end. In other words, mass action is simply circumstantial evidence of agency. *See Consolidation Coal Co. v. UMWA, Local 2216*, 779 F.2d 1274, 1277–79 (7th Cir.1985) (emphasizing, after rejecting the mass action theory as a separate theory of liability, that "evidence of mass action can be used by the employer in establishing common law agency liability"); *Eazor Express, Inc.*, 520 F.2d at 963 ("The premise [of the mass action theory] is that large groups of men do not act collectively without leadership...."); Jerald R. Cureton & Victor J. Kisch, *Union Liability For Illegal Strikes: The Mass Action Theory Redefined*, 87 W.Va.L.Rev. 57, 65–66 (1984) ("The better reasoned analysis is that mass action is not a separate and distinct theory of substantive law, removed and unrelated to rules of agency. Rather, it is an aspect of the law of agency which simply creates a mechanism whereby the fact of agency may be inferred").

The perception that mass action may be used as a separate theory by which union liability may attach has lingered as a result of opinions describing mass action *as though* it was a basis for finding union liability on non-agency grounds, even though a close reading of the opinions reveals that the term "mass action" is used as a synonym for circumstantial evidence of agency. For example, in *Alabama By–Products v. Local No. 1881*, 690 F.2d 831 (11th Cir.1982), the Court of Appeals affirmed the district court's finding of union liability, purportedly because the union in that case was "functioning as a union," and, therefore, "it must be held responsible for the mass action of its members." *Id.* at 833. However, the court then discussed the evidence supporting its finding, including a union meeting held to determine whether or not the membership should return to work, and the failure on the part of union leadership to return to work. The fact that the union appeared to act *en masse* was evidence supporting the court's finding of liability. The same court noted in a later decision that "[l]iability arises only when a union is acting as a union," and found "no support" for an employer's argument that mass action, without more, is sufficient to establish union liability. *Alabama Power Co. v. Local Union No. 1333*, 734 F.2d 1464, 1469 (11th Cir.1984).

Similarly, in *Island Creek Coal Co. v. Local 2232, UMWA*, 732 F.Supp. 666 (W.D.Va. 1990), the district court found union liability stemming from an unlawful strike, purportedly under the mass action theory, as an alternative to common law agency. This is the closest example of a pure mass action case that my research has revealed. The court needed only one paragraph to summarize the facts giving rise to union liability under the mass action theory:

> In other words, the testimony from the mouths of defendant's own officers is conclusive and undisputed that the entire membership of Local 2232 engaged in a strike over arbitrable issues in violation of the collective bargaining agreement, and that the leadership of the local participated in the strike. This is all that is required for a finding of liability under the mass action theory.

*Id.* at 671.

It is significant, however, that the court referred to statements from union officers that they participated in the strike along with the entire membership of the local un-

ion. In doing so, it is my view that that court conflated the concepts of agency and mass action theory.

It seems to me that the oft-quoted statement "that as long as a union is functioning as a union it must be held responsible for the mass action of its members," *Consolidation Coal Co. v. Local 1702*, 709 F.2d 882, 885 (4th Cir.1983), must be taken literally. As soon as the question of a union functioning as a union arises, the mass action theory collapses into classic common law agency. A true application of mass action as a distinct legal theory of liability would focus narrowly on the actions of the union membership, regardless of the actions taken or not taken by union officers. I have not seen such a case, and the good reason, I believe, is that after *Carbon Fuel* the only way to establish union liability is through a showing of agency.

■ Evidentiary invocation of mass action to prove agency is not inconsistent with *Carbon Fuel*. Union liability under Section 301 may only follow from a showing of agency, and mass action, properly understood, is, unlike the all reasonable means doctrine, a way of showing, or rather inferring, agency. *See also Keebler Co. v. Bakery Workers, Local 492–A*, 104 L.R.R.M. 2625, 2627–28 (E.D.Pa. 1980) (noting that *Carbon Fuel* did not disturb lower court's finding of mass action liability against local unions).

To summarize, the evidentiary application of mass action recognizes that unions are hierarchical associations, and that widespread and identical action on the part of many union members is unlikely in the absence of official direction. Given that reasonable starting point, additional evidence of official participation, encouragement, or approbation, whether explicit or tacit, permits an inference of agency.

The United States Court of Appeals for the Third Circuit has expressly refrained from deciding whether mass action "constitutes a legal basis, apart from agency, for finding a union responsible *or* is only *prima facie* proof of agency under section 301." *Philadelphia Marine Trade Ass'n v. Local 1291*, 909 F.2d 754, 759 (3d Cir.1990), *cert. denied* 498 U.S. 1083, 111 S.Ct. 953, 112 L.Ed.2d 1041 (1991) (emphasis added), but the disjunction suggests that it is one or the other. Moreover, footnote 11 of the *Philadelphia Marine* opinion, describing the evidentiary, as opposed to alternative substantive, understanding of mass action as "thoughtful," can be read as an indication that mass action retains some viability in this Circuit, contrary to defendants' assertion, Defendants' Reply to Plaintiff's Response to Motion for Summary Judgment in this Circuit 2.

■ Gateway has adduced sufficient evidence to permit at least an inference of Union agency on the part of the strikers whose actions caused the damages allegedly suffered by Gateway. Union rallies and meetings, and, especially, it is alleged, District meetings, associated with the Pittston Coal strike during mid–June 1989 were followed by work stoppages and pickets, most or all of which were apparently meant to show union solidarity with the striking employees of Pittston Coal Company. For example, Thomas D. Shumaker, elected to the UMWA International Executive Board by the membership of District 4, testified that at a District rally held subsequent to a June 14, 1989 District conference, and arranged by District and Local union activists, Shumaker Dep. at 59–60 (Plaintiff's App.Exh. 2), he stated, either to a newspaper reporter or to no one in particular, that the widespread work stoppages were "showing the coal industry and the public that the coal miners are sticking together. They believe this is what they've got to do to protect the Union." *Id.* at 70.

On June 15 and 16, 1989, pickets were raised throughout southwestern and central Pennsylvania, and UMWA members, including officers of Local 6330, did not report for work at plaintiff's mine beginning on June 16, 1989. Lunsford Deposition at 64–70. On June 16, 1989, at a UMWA District 2 rally in Ebensburg, Pennsylvania, District 2 President Nick Molnar overturned his lunch bucket, an action commonly understood to signal the start of a strike. NLRB Injunction Proceedings at 112 (Plaintiff's App.Exh. 7). Within twenty-four hours, most UMWA mines in Districts 2 and 4 were experiencing a work stoppage, NLRB Injunction Proceed-

ings (Plaintiff's App.Exh. 7), and by June 20, 1989, "the strike had spread to Pennsylvania, Ohio, Indiana, Illinois, Kentucky, Tennessee, Virginia, Alabama and Missouri." UMWA Leadership Update at 5 (Plaintiff's App.Exh. 35). Gateway employees and Local 6330 officers, and, allegedly, all other striking UMWA miners across the country, returned to work July 17, 1989, as requested by International President Richard L. Trumka in a July 15, 1989 telegram sent to all UMWA Local unions in Districts 2, 4, 5, 11, 12, 17, 19, 20, 23, 28, 29, and 30 (Plaintiff's App.Exh. 48).

■ Throughout the work stoppage, statements made by International and District officers could be construed as evidence of Union support for the non-Pittston strikers, even when delivered in the same breath, as it were, with back to work "orders." *See* July 7, 1989 UMWA Press Release (Plaintiff's App.Exh. 41); June 19, 1989 Remarks of Richard L. Trumka on NBC "Today" show (Plaintiff's App.Exh. 43); July 5, 1989 Remarks of Richard L. Trumka on CBS "This Morning" show (Plaintiff's App.Exh. 44). Directives to return to work during the strike period were ineffective and sometimes passive, indicating a lack of resolve. *See* Yankovich Dep. at 89–90; Undated UMWA "Back To Work" Letter (Plaintiff's App.Exh. 45) (Trumka Deposition Exh. 8) ("The International Union, United Mine Workers of America and [certain of its] districts and locals have been ordered to issue instructions, orders and directions, which we hereby do . . . instructing . . . you to refrain from inducing or encouraging [a strike]"); Undated UMWA "Back To Work" Letter (Plaintiff's App.Exh. 45) (Trumka Deposition Exh. 9) (UMWA has "no objection to your working or resuming work with your employer"). Union liability cannot be established *solely* by failure to take effective action to counter an unauthorized strike, *Carbon Fuel*, 444 U.S. 212, 100 S.Ct. 410, 62 L.Ed.2d 394 (1979); *Brenner v. Local 514, United Bro. Carpenters*, 927 F.2d 1283 (3d Cir.1991), but agency and ratification may be inferred if the union's response to illegal conduct is "foreseeably ineffective" or "predictably inadequate." *See District 30, UMWA v. N.L.R.B.*, 819 F.2d 651, 656–57 (6th Cir.1987); *Alabama Power Co. v. Local 1333, Laborers' Int'l Union of N. America,*

734 F.2d 1464, 1471 (11th Cir.1984); *Consolidation Coal Co. v. Local 1702, UMWA*, 709 F.2d 882, 886 (4th Cir.1983), *cert. denied* 464 U.S. 993, 104 S.Ct. 487, 78 L.Ed.2d 683 (1983); *Island Creek Coal Co. v. Local 2232, UMWA*, 732 F.Supp. 666, 672–73 (W.D.Va. 1990); *Airco Speer Carbon–Graphite v. Local 502, Int'l Union of Elec., Radio & Machine Workers of America*, 494 F.Supp. 872, 876–77 (W.D.Pa.1980).

Finally, there is direct evidence that as late as June 23, 1989, District 4 President Edward Yankovich insisted that the UMWA members' work stoppage had been authorized by the International. NLRB Injunction Proceedings at 141–42, 151–52 (Plaintiff's App.Exh. 7)

Taken together, Gateway's record evidence creates at least a genuine issue of material fact as to whether the pickets and work stoppage that affected Gateway were encouraged, authorized or ratified by the International, District 4, and Local 6330.

### C. *Damages*

The Unions argue that they are entitled to summary judgment on the damages, if not the liability, portion of Gateway's case, because plaintiff cannot prove with reasonable certainty that it actually sustained damages as a result of the strike. Specifically, the Unions note that because Gateway lost money in 1987 and 1988, and projected a $1.9 million loss in 1989, the year in question, it cannot possibly support a claim for lost profits. Defendants also argue that "it is undisputed that Gateway would not have mined any more coal had there been no work stoppage," and that even if more could have been mined, "there is no evidence that it would have sold this coal." Defendants' Brief in Support of Motion for Summary Judgment at 16. Finally, the Unions contend that Gateway's damages claim cannot include a claim for lost sales revenues or fixed costs because the company sold all the coal it would have sold, even had there been no strike.

In their Motion to Strike Damage Claim, defendants allege that Gateway is only now raising, *see* Plaintiff's Brief in Opposition to Motion For Summary Judgment at 81–82, a

new damages theory relating to fixed costs incurred during March 1990, and that they are considerably prejudiced by this eleventh hour claim. Gateway denies that it has shifted damages claims, and contends that the Unions' surprise derives not from the company's failure to disclose evidence relating to its damages claim, but from defendants' own failure to fully explore Gateway's claim for fixed costs. Plaintiff's Opposition to Motion to Strike Damage Claim 6–7.

The Unions are correct that any claim by Gateway for lost profits on coal that it allegedly would have mined and sold at a certain price during the approximately one month its employees were not working, is without support in the record. If Gateway claims that it would have mined and sold coal at a profit between approximately June 16 and July 16, 1989, but was unable to do so at that time or thereafter, then defendants are entitled to summary judgment on that claim. Gateway eventually mined and sold all coal, at roughly the same price, that it would have mined and sold whether or not its employees struck during June and July of 1989. Rietman Depo. at 111–112 (Defendants' App.Exh. K); McNutt Depo. at 429–30 (Defendants' App. Exh. N).

However, plaintiff's lost profits claim appears to turn not on *lost* sales revenues, but on the *timing* of the production and sales. Gateway avers that it was operating productively, even profitably, from March 1989 up until the June 16, 1989 strike. McNutt Depo. at 403–04. (Plaintiff's App.Exh. 59). Gateway argues that, were it not interrupted by the miners' strike, it would have continued operating profitably, at least until its "long wall" had to be moved, which was to take place during the designated vacation week commencing July 17, 1989. The month long work stoppage during June and July 1989 interrupted that productive work mode, plaintiff contends. Gateway was unable to pick up where it left off before the strike because of a roof fall in the mine, and because Gateway had to create extra downtime to move the long wall since work on the coal had not progressed enough to accommodate a move during the vacation period. The company maintains that because of a loss in

productivity and efficiency, due solely to the strike, it experienced a loss of $287,340. *Id.* at 397–405; Plaintiff's Brief in Opposition to Motion for Summary Judgment at 86.

Even in the absence of a strike, Gateway's operations would not have been profitable during the strike period. Gateway was a money-losing company in the two years preceding the strike, and was projected to lose $1.9 million in 1989. Gateway 1989 Annual Plan (Defendant's App.Exh. N). Gateway acknowledges that its "lost profits" claim is actually a claim for increased losses: "Gateway would have *lost less* money if it was able to continue to operate between June 16 and July 16, 1989." Plaintiff's Brief in Opposition to Motion for Summary Judgment at 85.

■ Gateway is permitted to seek damages for the aggravated losses it claims to have sustained during June 16 through July 16, 1989, as a result of the strike. Those alleged damages have been referred to by both parties as "lost profits," but, as plaintiff makes clear, Supplemental Brief in Opposition to Motion for Summary Judgment 14, they are nothing more than increased variable costs allegedly attributable to the work stoppage. If Gateway can prove that those allegedly increased variable costs aggravated its losses during the relevant period, it may recover those costs as damages. Whether Gateway would have maintained its productive capacity through mid-July of 1989 is a disputed factual issue which must be reserved for trial.

■ Plaintiff may also attempt to prove the fixed costs portion of its alleged damages. In the classic lost revenues case, fixed costs "are recoverable where the productive labor or output of the employer is reduced below its normal level as a result of the unlawful activity of the union." *Sheet Metal Workers Int'l Ass'n, Local 223 v. Atlas Sheet Metal Co.*, 384 F.2d 101, 109 (5th Cir.1967). Defendants seem to argue that because Gateway eventually resumed production, and earned revenues based upon the sale of coal mined subsequent to the strike, it should not be permitted to make any claim for fixed costs, even those that would not have been realized but for the strike, i.e., those costs attending Gateway's mine operations in March 1990.

406

But there is no reason either in the theory of damages or in damages jurisprudence why increased fixed costs should not be available as a result of *delayed* production. As the United States Court of Appeals for the Third Circuit stated in *Foam & Plastics Div., Tenneco Chem., Inc. v. General Drivers & Helpers Local Union 401*, 520 F.2d 945 (3d Cir. 1975), "the measure of damages arising from a breach of a 'no strike' provision of a collective bargaining agreement is the *actual loss* sustained by reason of the breach." *Id.* at 948 (emphasis added). That uncontroversial statement reflects the notion that Section 303 of the NLRA is compensatory in nature, and that damages may be "recovered for actual losses sustained as the result of the unlawful secondary activity." *Kerry Coal Co. v. UMWA*, 488 F.Supp. 1080, 1101 (W.D.Pa. 1980), *aff'd* 637 F.2d 957 (3rd Cir.1981) (quoting *Sheet Metal Workers Int'l Ass'n, Local 223 v. Atlas Sheet Metal Co.*, 384 F.2d 101, 109 (5th Cir.1967)). *See also Midland Ross Corp. v. United Steelworkers of America*, 83 F.R.D. 426, 428 (W.D.Pa.1979) ("the victim of an illegal strike is permitted to recover fixed costs attributable to the period of the strike").

Plaintiff acknowledges that no production was *ultimately* lost as a result of the 1989 strike, but that fact does not erase, or mitigate, the *additional* month of fixed costs it allegedly would not have been required to pay but for the strike. To the extent Gateway can prove these alleged costs, and show that they constitute part of its "actual loss sustained by reason of the breach," *Foam & Plastics Div., Tenneco Chem., Inc. v. General Drivers & Helpers Local Union 401*, 520 F.2d at 948, there is no legal basis for keeping them out of the damages equation.

■ In their briefs in support of their motion for summary judgment, and in their motion to strike damages claim, the Unions claim they will be unfairly prejudiced by what they characterize as plaintiff's eleventh hour shift in its damages theory from June and July 1989 fixed costs to March 1990 fixed costs. Gateway denies that it has changed its damages theory: "at most, [plaintiff] has identified a way to overcome the UMWA's defense which the UMWA failed to perceive

or pursue in discovery." Plaintiff's Brief in Opposition to Defendants' Motion to Strike Damage Claim at 8.

Plaintiff has indeed changed its damages theory. Richard McNutt, plaintiff's expert damages witness, testified during his July 29, 1992 deposition that the twenty days he was considering for the purpose of calculating Gateway's lost profits and fixed costs included the period from June 16, 1989 through July 14, 1989. July 29, 1992 McNutt Deposition at 102–03 (Plaintiff's Supp.App.Exh. 71). Plaintiff did not even hint at a claim for fixed costs in March 1990 until the Unions' motion for summary judgment was briefed, after the close of discovery. Nevertheless, unlike the cases cited by defendants in their Memorandum in Support of Motion to Strike Damage Claim, this matter has not been tried, nor even listed for trial. The possibility of irreparable prejudice is at most remote. Both parties have known all along that the closing of Gateway's mine, and the timing of that event, were an issue that could bear on plaintiff's damages claim, and plaintiff's fixed costs argument is merely a new spin on old facts rather than an introduction of new facts altogether.

■ Plaintiff's new fixed costs argument can be viewed as essentially an attempt to amend its complaint. As discussed, *supra*, the new fixed costs argument is not without legal basis, and therefore not futile, since it alleges damages due to (if not during) the 1989 strike. Federal Rule of Civil Procedure 15 provides that leave to amend a pleading be "freely given when justice so requires." *See also Bechtel v. Robinson*, 886 F.2d 644 (3d Cir.1989) (court should use "strong liberality" in considering whether to grant leave to amend). An amended complaint is considered unduly prejudicial if it causes undue delay, or evidences bad faith or dilatory motive on the part of the movant. *See Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962). Defendants do not argue that plaintiff's new theory will cause undue delay, and there is neither any allegation nor evidence of bad faith or dilatory motive on the part of Gateway.

### *ORDER*

**AND NOW,** this 15th day of April, 1994, consistent with the foregoing opinion, the defendant Unions' Motion for Summary Judgment (Docket No. 28) and Motion to Strike Damage Claim (Docket No. 39) are denied. Plaintiff's complaint is hereby amended to include a damages claim for fixed costs during March 1990. Should defendants require additional discovery concerning plaintiff's new damages theory, they shall apply to the Court for a short extension of the pre-trial schedule by no later than Friday, April 29, 1994.